## STATE *vs.* SARGENT & COMPANY.

The owners of land bounded on a harbor own only to high-water mark. They have a right to construct wharves upon the soil below that line, if they conform to such regulations as the state shall see fit to prescribe, and do not obstruct navigation.

The duty of protecting the paramount right of navigation rests upon the legislature, and they are to determine for themselves by what methods and instrumentalities they will discharge it.

They have power to vest in commissioners appointed by themselves authority to restrain such proprietors from extending structures into navigable waters.

The enactment of such a law is in no sense an exercise of the right of eminent domain. The public do not appropriate or use any right of the land-owner in the soil of the shore.

The act of 1872, establishing a board of commissioners for New Haven harbor, to be appointed by the Governor with the advice of the Senate, in one section gives the board power to prevent and remove encroachments upon the waters of the harbor, in another section authorizes them to prescribe harbor lines beyond which no structure should be extended, giving notice to all persons

State v. Sargent.

interested to appear and be heard and making a report to the General Assembly, and in another section makes any structure within the tide-waters of the harbor, not approved by the commissioners, a public nuisance, and authorizes the commissioners to bring suits in the name of the State to stop any such erection. Held—

1. That the act was constitutional and valid.
2. That it was not necessary for the commissioners to establish a general harbor line before forbidding or removing any particular encroachments.

The act was passed in 1872. By the revision of 1875 it was provided that all public laws not contained in the revision, except acts which though public in form were of a private nature, and some others, were thereby repealed. This act was not contained in the revision. By an established custom the acts of each year were published by the secretary of the state in two pamphlets, one called "Public Acts," and the other "Private Acts and Resolutions." This act was published among the private acts for the year 1872. Held that it was to be presumed that the legislature acted with reference to this usage and to the classification made by the secretary in this instance, and intended to preserve the act in question under the description of acts which though public in form were of a private nature.

PETITION in the name of the State, by the board of harbor commissioners for New Haven harbor, to the Superior Court, for an injunction restraining the defendants, a corporation, from constructing a wharf or other structure from their own land into the harbor, beyond a certain limit, without the approval of the harbor commissioners.

The following facts were found by the court:—

The board of harbor commissioners for New Haven harbor was organized in October, 1872, under the act of the General Assembly of June 27th, 1872, and, when the present suit was brought, was composed of the persons named in the petition.

The respondent corporation of "Sargent & Company" was, when the suit was brought, and, with its grantors, for more than fifteen years prior thereto had been, the owner, and in actual possession, of the upland comprised within and bounded by Wooster street on the north, East street on the east, Hamilton street on the west, and Water street on the south, in the city of New Haven, and had also, for the same period, with its grantors, claimed title to a water lot or piece of flat land within the shore of New Haven harbor, bounded on the north by Water street, between East and Hamilton streets; which title was derived, by sundry mesne conveyances, from the proprietors of the common and undivided

lands of the town of New Haven, and purported to convey to said Sargent & Company all that portion of said shores, bounded northerly as aforesaid, fronting their said upland and extending, in some places nine and in other places ten rods, southerly into the harbor.

The proprietors referred to had no other title to the shore lot described in the deeds than such as they may have derived from the charter of Connecticut, or the acts of the General Assembly.

Prior to June, 1877, Sargent & Company and their grantors had, under the foregoing claim of right, filled in with earth a portion of the shore, between high and low water marks, fronting their upland, so that between Wallace and Hamilton streets the new ground so made extended nearly five hundred feet from the southerly line of Water street.

On the 8th of June, 1877, Sargent & Company advised the board of harbor commissioners that they proposed to construct certain wharves, with slips, which should extend from the new made ground before referred to, to a point in the harbor fourteen hundred feet from Water street; and they submitted to the board a plan of their proposed work, and requested a permit for its construction.

On July 2d, 1877, the board notified Sargent & Company that, upon consideration of their application, they had voted that, pending the establishment of an extension harbor line between Tomlinson's Bridge and Long Wharf, permission was granted them to build wharves in front of their property to a distance not exceeding eight hundred feet outward from the southerly line of Water street.

On the 7th of July, 1877, Sargent & Company returned the notification of permit to the board endorsed "declined and returned," and they proceeded to build walls and drive piles, in substantial accordance with their original plan, until, at the bringing of the present petition, a line of such work, to form one side of a proposed wharf, had been built, extending outward into the harbor eleven hundred and forty-eight feet from Water street.

The wall so built and piles so driven since July 7th, 1877,

and the structures contemplated by the plan aforesaid, are within New Haven harbor, as defined by section 9 of the act of June 27th, 1872.

Upon these facts the case was reserved for the advice of this court.

The following is the material part of the act of 1872, under which the harbor commissioners were appointed and acted:—

"AN ACT TO ESTABLISH A BOARD OF HARBOR COMMISSIONERS FOR NEW HAVEN HARBOR.

" *Be it enacted, &c.*

" SEC. 1.   The Governor, with the advice and consent of the Senate, shall, before the first day of July next, appoint five competent persons, resident in the city of New Haven, or in the town of East Haven, who shall constitute a Board of Harbor Commissioners for New Haven harbor, and who shall hold their offices from the dates of their respective appointments, and for the terms of one, two, three, four and five years, respectively, from the first day of July next; the term of each to be designated at the time of his appointment, respectively, from the first day of July next.   The Governor shall, in like manner, before the first day of July in every year after this year, appoint a commissioner to continue in office for the term of five years from said day.      *      *      *

" SEC. 2.   Said Board of Harbor Commissioners shall have the general care and supervision of New Haven harbor and its tide-waters, and of all the flats and lands flowed thereby, in order to prevent and remove unauthorized encroachments, and causes of every kind which are liable to interfere with the full navigation of said harbor, or in any way injure its channels, or cause any reduction of its tide-waters.   They may, from time to time, make such surveys, examinations and observations as they may deem necessary in said harbor for said purpose, and employ for these purposes competent engineers, and also employ such clerical and other assistance as they may think necessary.      *      *      *      *

" SEC. 3.   Whenever in the judgment of said board the public good requires, they may proceed to prescribe harbor

lines in said harbor, beyond which no wharf, pier, or other structure shall be extended into said harbor, and shall report the same for the consideration of the General Assembly at its next session: provided however, that said commissioners, before drawing any such line, shall appoint a convenient time and place for hearing all persons interested, and shall give notice thereof by publication two weeks successively, in two or more newspapers published in the city of New Haven, the first publication to be at least twenty days before the time of hearing.

" SEC. 4. All persons contemplating the building over said harbor and tide-waters any bridge, wharf, pier or dam, or the filling any flats, or driving any piles below high-water mark, shall, before beginning it, give written notice to said commissioners of the work they intend to do, and submit plans of any proposed wharf or other structure, and of the flats to be filled, and of the mode in which the work is to be performed; and no such work shall be commenced until the plan and mode of performing the same shall be approved in writing by a majority of said commissioners; and said commissioners shall have power to alter said plans at their discretion, and to prescribe the direction, limits, and mode of building the wharves and other structures, and all such works shall be executed under the supervision of said commissioners.

" SEC. 6. Any erection or work hereafter made in any manner not sanctioned by said commissioners, where their direction is required as hereinbefore provided, within tide-waters flowing into or through said harbor, shall be deemed, and is hereby declared to be, a public nuisance. Said commissioners shall have power to order suits in the name of the State to prevent or stop, by injunction or otherwise, any such erection or other nuisance in the tide-waters flowing into or through said harbor, and such suits shall be conducted by and at the expense of the city of New Haven.

" SEC. 7. Said commissioners are authorized and empowered, whenever they deem it necessary, to apply to Congress for appropriations for protecting and improving said harbor.

" SEC. 8. All expenses incurred by said commissioners

shall be paid by the city of New Haven, in the same manner as is now provided in the charter of said city for the payment of other claims and accounts; but no contracts shall be made and no acts done by said commissioners, which involve the payment of any money from the treasury of said city, except as herein provided, without an appropriation expressly made for that purpose by the Court of Common Council of said city.

"SEC. 9. [Describes the boundaries of New Haven harbor.]

"SEC. 10. Nothing contained in any of the provisions of this act shall be construed to authorize or empower said commissioners to grant or convey to any person or persons any right or title in or to any of the tide-water flats of said harbor.

"SEC. 11. This act shall take effect from its passage.

"Approved, June 27th, 1872."

*C. R. Ingersoll* and *T. E. Doolittle*, for the State.

1. It is now settled law in the United States that the several states (subject to the limitations of the federal constitution) are sovereign over their respective sea-shores and tide-waters—that, unless parted with by colonial legislation, they have succeeded to all the rights in this respect which both crown and parliament possessed at common law; having, not only the *jus publicum*, or right of governing the sea and sea-shore for the protection of public rights, but also the *jus privatum*, or title to the soil itself of the shore below high-water mark. *Martin* v. *Waddell*, 16 Pet., 410; *Barney* v. *Keokuk*, 94 U. S. R., 324; *McCready* v. *State of Virginia*, id., 391; *Church* v. *Meeker*, 34 Conn., 429. But this title to the shore is held by the state, as it was held by the crown, not as a private title, but in trust for the public use and benefit. *Gann* v. *Free Fishers of Whitstable*, 11 Clark's House of Lords Cases, 192; Angell on Tide-Waters, 80. It is by reason of this sovereignty that the states control and regulate by their legislation the use of the navigable waters within their respective jurisdictions, and that the sanction of such legis-

lation is necessary to justify any interference by the individual citizen with the ordinary flow of those waters, except in the exercise of his public or common right. Thus, this power of control has been recognized in the establishment of harbor lines and regulation of wharf rights. *Commonwealth* v. *Alger*, 7 Cush., 53; *Att. Gen.* v. *Boston & Lowell R. R. Co.*, 118 Mass., 345; *Att. Gen.* v. *Woods*, 108 id., 436; Cooley's Const. Lim., 589; Angell on Tide-Waters, 236. In the appointment of harbor-masters. *Vanderbilt* v. *Adams*, 7 Cow., 349. In the removal of obstructions to navigation. *Hollister* v. *Union Co.*, 9 Conn., 436. In the regulation of draw-bridges and dams. *Bridge Co.* v. *Bunnell*, 4 Conn., 54; *Holyoke Co.* v. *Lyman,* 15 Wall., 500. In the construction of public works, such as dams, roads, docks, &c., although rendering the land of the riparian owner inaccessible. *Lansing* v. *Smith*, 4 Wend., 9; *Gould* v. *Hudson River R. R. Co.*, 6 N. York, 522; *People* v. *Tibbetts*, 19 id., 523; *People* v. *Canal Appraisers*, 33 id., 461; *Atlee* v. *Packet Co.*, 21 Wall., 394; *Barney* v. *Keokuk*, 94 U. S. R., 324. In the regulation of fisheries. *McCready* v. *State of Virginia*, 94 U. S. R., 391; *Chalker* v. *Dickinson*, 1 Conn., 510.

2. This title to the shore, which the colony of Connecticut acquired by its charter, was never parted with. *East Haven* v. *Hemingway*, 7 Conn., 202; *Church* v. *Meeker*, 34 id., 429. But a usage, obtaining the force of a local common law, gave to the proprietor of the upland a privilege of wharfing out against his land into the tide-waters. But this privilege is subservient to the paramount public right of navigation. It allows nothing to be done under it "to the injury of the free navigation of the water by the public." *Mather* v. *Chapman*, 40 Conn., 395. And anything that may be done under it is "subject to the right of the public to abate it, if it be a nuisance." *Nichols* v. *Lewis*, 15 Conn., 143.

3. But it is of little consequence, in this case, whether this privilege of the upland proprietor is a right of private property or not. In either case, any damage it may be subjected to by such regulation as this in question, is *damnum absque injuria*. In Massachusetts such proprietor has a title

in fee-simple to a certain extent of shore. But it does not exempt him from the operation of similar regulations. *Commonwealth* v. *Alger*, 7 Cush., 63. And so in the other cases before cited. "The state, in its sovereign character, owns the bed of navigable streams to high-water mark, and the right of a riparian owner is subservient to the power in the state to abridge or destroy it at pleasure." *People* v. *Tibbetts*, 19 N. York, 523; *Musser* v. *Hershey*, 42 Iowa, 361; *Barney* v. *Keokuk*, 94 U. S. R., 391.

4. The deeds from the proprietors' committee to the grantor of the defendants do not help the defendants, for the proprietors had no title to the shore. *Church* v. *Meeker*, 34 Conn., 429.

5. The act of 1872 has not been repealed by section 1, title 22, of the General Statutes. The question which here arises is: Did the General Assembly by this provision *intend* to repeal the act referred to? Dwarris on Statutes, 690, 699, 701, 704; 1 Kent Com., 462; *Bishop* v. *Vose*, 27 Conn., 9. Applying these rules of construction it becomes clear that the General Assembly intended by the phrase " acts of a private nature," those acts which the General Assembly commonly styles "private acts," or "special acts," and which comprise acts "*local* in their nature though public in form," and are by the General Assembly distinguished from the "General Statutes," which relate to the state at large. Now the act establishing the board of harbor commissioners for New Haven harbor was, when it was published by the General Assembly, declared to be a special act. For years the General Assembly has published its acts in two classes, one denominated by itself as the "Public Acts," and the other as the "Private Acts," or "Special Acts." And those "Private Acts" so published have been authenticated by the General Assembly and made evidence in its courts of justice. The act now in question was so published by the General Assembly in 1872, and thus authenticated to be a special act, and not a public act in the sense of a general statute. *Eld* v. *Gorham*, 20 Conn., 16. But the meaning of the General Assembly is apparent upon an examination of the title in question itself.

Its provisions are declared to be "for defining and establishing the *general* statutes." It was not intended to interfere with any other legislation than such as was embodied in the "General Statutes" or "Public Acts" of the state. The distinction between public and private acts has always been known to the common law. "Private acts," says Dwarris, were originally "such petitions and answers as did not appear on the statute roll, or in the collection of acts." On Statutes, 627. He divides acts into "public and general" and "private and special." Public acts relate to the kingdom at large. But "acts relating to any particular place, or to divers particular towns, or to one, or to divers particular counties, or to colleges only in the universities, are private acts." p. 629. The act in question is a private act, because it is a local act. It is not a public act, because it does not embrace within its jurisdiction the whole state. *Woodward* v. *Cotton,* 1 C. M. & R., 44; 1 Swift Dig., 10.

6. The construction claimed for the act by the defendants denying any efficacy to sections 4 and 5, until harbor lines have been established under section 3, is not warranted by either the letter or spirit of the act. There is nothing whatever in its language evincing that the commissioners were not to "have the general care and supervision of New Haven harbor, *in order to prevent or remove unauthorized encroachments,*" until the time in the indefinite future when the public good might require the establishment of a general system of harbor lines. On the contrary, the language is clear and explicit. The act was to take effect from its passage. And when it took effect the board of commissioners (when appointed) was charged with the duties so pointedly declared in section 2, and which require the powers conferred by section 4 for their proper discharge. And the spirit of the act in all its parts is to provide at once for the protection of this public highway from private encroachment and for the regulation of the common rights existing there.

*J. S. Beach* and *H. B. Harrison,* for the defendants.

1. It is well settled in Connecticut—1st. That the state

State *v.* Sargent.

is not, in every respect, the absolute owner of the shores and flats, to the exclusion of all rights of the owners of the uplands therein. 2d. That the owners of the uplands are not, in every respect, the absolute owners of such shores and flats, to the entire exclusion of all rights of the state therein. 3d. That the state has certain fixed and vested rights in reference to such shores and flats, and the upland-owners have certain fixed and vested rights therein, and that each of these two sets of rights must be exercised so as not to violate the other. 4th. That the state technically owns the fee of the land below high-water mark—but owns it only "in trust" for the public for the purpose of protecting the public right of navigation, and for no other purpose; so that, though theoretically vested with the fee, the state has none of the ordinary rights of an owner in fee in reference to such land. 5th. That the owner of the upland, although he has no right to use such land so as to materially obstruct navigation, possesses, in reference to such land, all the other rights which properly belong to an owner of land in fee. He has a right to wharf out upon and over such land to the channel; he may maintain ejectment for such land upon which he has so wharfed out, and the theoretical title of the state in fee cannot be set up to defeat his action; his title to such land will descend to his heirs at law; he may sever from his upland his interest in the flats, and convey that interest, apart from the upland, in the same manner as if he owned the flats in fee. *East Haven* v. *Hemingway*, 7 Conn., 186; *Chapman* v. *Kimball*, 9 id., 38; *Nichols* v. *Lewis*, 15 id., 137; *Simons* v. *French*, 25 id., 346; *Frink* v. *Lawrence*, 20 id., 117; *Burrows* v. *Gallup*, 32 id., 493, 500; *Church* v. *Meeker*, 34 id., 427. In substance, then, the owner of the upland is the owner of the shores and flats to the channel, without the right of materially obstructing navigation. And in substance the state has no ownership of such shores and flats; but its only substantial right in reference to them is the right of protecting against obstructions to navigation the waters which ebb and flow over them. See cases above cited; also Angell on Tide-Waters, 207; *Commonwealth* v. *Alger*, 7 Cush., 53, 65,

74, 80; *Yates* v. *Milwaukee*, 10 Wall., 497, 504; *Weber* v. *Harbor Commissioners*, 18 Wall., 57, 64; *Keyport Steamboat Co.* v. *Farmers' Transportation Co.*, 18 N. Jer. Eq., 13.

2. As this right of the state to protect navigation belongs to it, not as a land-owner but as a *sovereign*, it is a right which can only be exercised by legislation; by the enactment of *laws*, duly made, in subordination to the constitution, by the General Assembly. Those fundamental principles which defend the property of the individual against arbitrary invasion by the state, are applicable to such laws as much as to any other laws.—1st. Such laws, like all others, must be made by the General Assembly itself. The legislature cannot delegate to a committee the power to make them.—2d. Every such law must be, not merely in form but in fact, a *law*—a rule of action imposed on all citizens, (or upon all citizens of a specified class or within a specified locality)—and not a decree against a particular individual.—3d. Every such law, so far as it limits the wharf-rights of the owners of uplands, must be, in substance and spirit, a law regulating the exercise of those rights for the benefit of navigation; and not, in substance and spirit, an enactment destroying such rights "without due process of law" or taking them away without "just compensation." *Commonwealth* v. *Alger*, 7 Cush., 53; *Yates* v. *Milwaukee*, 10 Wall., 497; *Weber* v. *Harbor Commissioners*, 18 id., 65; *Lake View* v. *Rose Hill Cemetery Asso.*, 70 Ill., 191, 197. The statute of 1872 purports to be, (and, upon our interpretation of it, is in fact,) such a law, duly enacted, in conformity with the constitutional principles above asserted. If however our interpretation of it is wrong, and if the true interpretation of it puts it in conflict with any of those principles, it is unconstitutional and void. The court will therefore give to the statute, if possible, an interpretation which will not put it in conflict with any of those principles.

3. The statute is, in some respects, obscure; but its controlling purposes are plain. It contemplates—1st. A general supervision of the public rights in New Haven harbor by a board of harbor commissioners.—2d. The establishment of a harbor-line if the "public good" shall require the limitation

of the wharf-rights of upland-owners by any such harbor-line; but not otherwise.—3d. The decision by the General Assembly, (and not by the harbor commissioners,) of the question whether (and, if ever, when,) the "public good" requires such limitation of the rights of upland-owners by any such harbor-line.—4th. The establishment of such harbor-line (if it shall be established at all) by the General Assembly itself, and not by the harbor commissioners.—5th. The prevention and punishment of transgressions of any such harbor-line, if, and after, such harbor-line shall be so established.—6th. Superintendence by the harbor commissioners, (*after* such harbor-line has been established,) of those details of wharf-construction which, from the nature of the case, cannot be prescribed by any statutory regulation. Such is the substance of the act. This construction is reasonable, and gives full effect to section 3d, as well as to every other section of the act. "All statutes, whether remedial or penal, should be construed according to the apparent intention of the legislature, to be gathered from the language used, connected with the subject of legislation, and so that the entire language shall have effect, if it can, without defeating the obvious design and purpose of the law. And in doing this, the application of common sense to the language is not to be excluded." CHURCH, C. J., in *Rawson* v. *The State*, 19 Conn., 299. See also *Bishop* v. *Vose*, 27 Conn., 9; Sedgwick's Stat. & Const. Law, 238. We do not ask the court to go outside of the language of the statute in order to find the intention of the legislature. But we claim that full effect shall be given to its intention as manifested by the language of the statute. At the same time, inasmuch as the statute is highly penal in character, we claim that it must be construed liberally in favor of this respondent, and strictly as against the state.

4. The act does not mean to give the commissioners, (before and without the establishment of any harbor-line,) the power of selecting, at their caprice, one or another of the upland owners, and, by their mere veto, without any judicial process or inquiry, absolutely extinguishing his right of wharfage.—1st. The General Assembly itself could not thus

single out, at its pleasure, a particular upland-owner, and, by an enactment under the form of a law, extinguish his rights. Such an enactment would not be a "law." It would be a mere arbitrary decree, outside of the powers of a constitutional government. *Goshen* v. *Stonington*, 4 Conn., 225; *Norwich Gas Light Co.* v. *Norwich City Gas Co.*, 25 id., 38; *Welch* v. *Wadsworth*, 30 id., 150; *Bostwick* v. *Isbell*, 41 id., 305; Cooley Const. Lim., 90, 91; Sedgwick Stat. & Const. Law, 166. It would be an attempt to deprive the citizen of his property without "due process of law." It would be an attempt to destroy rights under pretense of regulating the exercise of rights.—2d. If the General Assembly could not itself constitutionally issue such a decree against a particular upland-owner, much less could it constitutionally confer upon a board of commissioners the right of issuing such a decree. *Yates* v. *Milwaukee*, 10 Wall., 497, and other cases above cited; Cooley Const. Limitations, 116; Sedgwick Stat. & Const. Law, 149, 177.—3d. The General Assembly having manifested in section 3d its intention to limit the rights of upland-owners, only after due inquiry, with previous "notice" to, and "hearing" of, "all persons interested," and only then by a harbor-line applicable equally to all of them, it will hardly be pretended that the same General Assembly intended, at the same time, by section 4th, to extinguish utterly at one blow all those important rights of property, without any such inquiry, notice or hearing, leaving the revival or partial revival of those rights, in each individual case, to the arbitrary and unlimited discretion or caprice of the harbor commissioners.—4th. If such be the true construction of the act, then the act is void; first, as destroying absolutely rights of property under pretence of regulating the exercise of them, (rights which the state has power only to regulate, but not to destroy, except, so far as they will necessarily be destroyed by an act of real and *bonâ fide* regulation,) and thereby depriving the citizen of his property without due process of law; and, secondly, as an attempt, in effect, to delegate to the harbor commissioners the power of legislation —or rather, as above stated, the power of determining by

State *v.* Sargent.

their capricious decrees, and without appeal, whether valuable rights of property of individual citizens shall be exercised by them or not.

5.  The statute of 1872 has been repealed.  Revision of 1875, tit. 22, p. 551.  Section 1st of that title is as follows: "All public laws not contained in the foregoing titles, except acts of incorporation, confirming acts, acts which though public in form are of a private nature, and all public laws, except such as by particular provision and this title are continued in force, are repealed."  The statute of 1872 does not come within any of the exceptions above specified.  1st.  It is not only "public in form," but it is public in "nature."  It creates a board of officers who are officers of the state at large.  Those officers are appointed by the governor and the senate acting concurrently.  They are commissioned in the name of the state.  Their functions are, in their nature, the functions of officers of the state.  The commissioners are instrumentalities by means of which the state exercises its high public right as a sovereign, to protect navigation within its limits.  They are required by section 3d to report to the General Assembly their acts under that section.  They are authorized, as agents of the state, to institute suits in the name of the state.  This very suit is prosecuted by them in the name of the state.  They are also authorized to represent the state in applications to Congress for appropriations.  Although the act relates, in one sense, to a particular locality, that fact does not make the act "private" in nature.  The act is designed to protect the rights and promote the interests of all persons who may be interested in the navigation of New Haven harbor—not merely the people of New Haven, but all citizens of this state, and of the United States, and of other countries, who may have occasion to use the harbor.  And the prohibitions of the statute apply to all persons.  All persons are forbidden by it to interfere with the harbor in the ways prohibited.  Cooley's Const. Limitations, 390; *People* v. *Allen,* 42 N. York, 378; *State* v. *County Commissioners,* 29 Maryl., 516; *Pierce* v. *Kimball,* 9 Greenl., 54; *Commonwealth* v. *McCurdy,* 5 Mass., 324; *Burnham* v. *Webster,* id.,

266; *New Portland* v. *New Vineyard*, 16 Maine, 69;. *Gorham* v. *Springfield*, 21 id., 58; *State ex rel. Cothren* v. *Lean*, 9 Wis., 279; *Clark* v. *Janesville*, 10 id., 136; *Levy* v. *The State*, 6 Ind., 281; *Rogers's Case*, 2 Greenl., 303; *U. States* v. *Porte*, 1 Cranch C. C., 369; *Fall Brook Coal Co.* v. *Lynch*, 47 How. Pr. R., 520; *Heridia* v. *Ayres*, 12 Pick., 334, 344. A decisive criterion of the public "nature" of the act is to be found in the fact that it made criminal, indictable, and punishable by fine and imprisonment, certain things which, but for this statute, would not have been criminal, indictable or punishable. *State ex rel. Cothren* v. *Lean*, 9 Wis., 281; *Rogers's Case*, 2 Greenl., 303; *U. States* v. *Porte*, 1 Cranch C. C., 369; *Heridia* v. *Ayres*, 12 Pick., 334, 344; Sedgwick Stat. & Const. Law, 33. Under section 6th an upland-owner who drove piles into the harbor without in the least obstructing navigation in fact, and who, by so doing, would not (but for this statute) have been guilty of creating a public nuisance, might be, (and under the petitioner's construction of the statute would have been,) by omitting to get the sanction of the commissioners for the driving of the piles, guilty of committing a "public nuisance" within the letter and meaning of that section. Such an act would have been a criminal offence at common law; and punishable by fine and imprisonment as such.

PARDEE, J. By the common law as it stood long before the coming of our ancestors to this country and the settlement of the colony of New Haven, the king, as *parens patriæ*, held the title to the soil under the sea between high and low water mark; he held it not for his own benefit but for his subjects at large, and for the subjects of all states at peace with him; he held it in trust for public uses, established by ancient custom or regulated by law, the most important of which are those of fishing and navigation. In 1662 Charles II granted all the lands of the colony by charter to the freemen incorporated thereby. This court said in *Church* v. *Meeker*, 34 Conn., 421, that there had been in this state no judicial determination of the question whether or not that

charter conveyed the royal title to the shores of the sea; that the Supreme Courts of Massachusetts, New Jersey and of the United States, having each decided that similar grants did, under the head of "royalties," convey such title, this court would follow them and declare that the title to the "shores of the sea" vested in the freemen of the colony before the king was excluded by the revolution and independence; and that they, through their legislature, may therefore now exercise all the powers which previous to the grant could have been exercised either by the king alone or by him in conjunction with his parliament, subject only to those restrictions which have been imposed by the constitution of this state or of the United States.

The respondents as owners of land bounded on a harbor, own only to high-water mark. It is true they have a right to construct wharves upon the soil below that line if they conform to such regulations as the state shall see fit to impose upon them and do not obstruct the paramount right of navigation. From their land bounding upon the shore they hold the exclusive right to embark and go upon the sea, for the reason that no other person can enter upon their land for embarkation or for any other purpose without their permission; but every person has the superior right to navigate the waters opposite thereto without obstruction from any structure erected by them.

The duty of protecting this dominant right rests upon the legislature; and they are to determine for themselves by what methods and instrumentalities they will discharge it. It is plain that they themselves cannot descend to the making of frequent examinations into the situation of each riparian proprietor upon our extended coast. There is no bar in reason, and none in the constitution, to the vesting in commissioners appointed by themselves the power to restrain such proprietors from extending structures into navigable waters; they part with no legislative power; they enact the law; the commissioners by the aid of the courts enforce it. Besides, this mode of performing the service which the legislature owes to the commerce of the world has so often received both

legislative and judicial sanction in other jurisdictions that it is now quite too late to challenge it.

The enactment of the law is in no sense an exercise of the right of eminent domain; it is not that taking of private property for public use for which compensation is to be made. The public do not propose in any manner to appropriate or use any right of the respondents in the soil of the shore, but only to guard against any invasion by them of the paramount right of the public to navigate the waters over it; to enforce against them the maxim—*sic utere tuo ut alienum non lœdas*. It is only the exercise of the police or supervisory power vested in the legislature—the power to enact such laws as they deem reasonable and necessary for the regulation of the use by riparian proprietors of their qualified right to the soil of the shore. Indeed no individual is the absolute owner of any land in so high a sense as that he can set the legislature at defiance as to the use he may make of it; as part of the price to be paid for the privilege of living under law he subjects himself to certain restrictions for the public good; to limitation upon the profitable use of his property for the promotion of the general welfare. The prohibitions against wooden buildings, powder magazines and slaughter-houses in cities, are common instances of this.

The shore line is irregular, broken by alternate indentations and projections, and the deep water channel is at every possible angle with, and at varying distances from it. The unrestrained desire of proprietors to build first and farthest leads them to invade and obstruct the channel. Hence the occasion for legislative interference for the preservation of the acknowledged right of all vessels to access to all wharves. Neither in its provisions nor in its mode of execution is the act in violation of any of the fundamental principles of the social compact; on the contrary its effect is greatly for the wealth and peace of the public. The manner of its enforcement is open and fair. The respondents first advised the commissioners specifically of their plans; this opened the door for a hearing; after hearing and consideration the latter advised them that the proposed structure would obstruct the public

right of navigation. Here was a day in court; a day before a tribunal presumably impartial and specially qualified to determine the precise matter entrusted to them.

Nor does the law become partial and individual in its scope and operation for the reason that the commissioners are clothed with power to limit the extent to which any proprietor may reach out from his shore line towards or into navigable waters, and that it therefore will result that *A, B* and *C* will be permitted to build wharves of different lengths. The location of the land of each, the configuration of his shore line, the relative position of the channel, and the outline of the whole harbor as it bears upon his particular case, are all to be taken into consideration and weighed by the commissioners; they are to determine the largest measure of use of his right to the shore which each can enjoy consistently with the greatest benefit to the public. And this general rule is to be applied alike to the respondents and all other owners; each is to surrender precisely what is necessary to prevent his wharf from being an obstruction. Therefore so far as the law and the reason of its being are concerned the surrender by each is precisely the same.

We are to take notice that the wharves in New Haven harbor have now become numerous and valuable; that the effort to extend them has invited public attention and legislative interference; that the act in question is an exception to the ordinary rule by which laws operate only after the adjournment of the legislature enacting them, and is made to take effect upon its passage. From these facts we are to infer that, so far forth as its protecting power is concerned, it was intended for immediate effect; and this is the interpretation to be put upon it. We regard the establishment of a harbor line as a matter quite apart from the duty of the commissioners to take the harbor at once into their keeping. The existence of such a line spanning the whole harbor is not at all necessary to the exercise of their restraining power over a structure immediately to be built. The high and low water lines, and the course of the channel being known, they have all necessary data for action in reference to each case as it arises.

But, if in their opinion the public right of navigation could be more perfectly protected and the conflicting claims of proprietors more satisfactorily adjusted by the immediate establishment of a line for the whole harbor, in advance of any intention to build wharves, they are authorized to advise the legislature as to the course which in their judgment such a line should follow; but it is obvious that its highest usefulness could only be secured by the immediate exercise of the power to hold all proprietors in check until there is opportunity for legislative action. So far as the erection of any proposed wharf is concerned they must act at once; so far as this general line is concerned they may act at once or never.

By section 1, title 22, page 551, of the revision of 1875, it is enacted as follows: "All public laws, not contained in the foregoing titles, except acts of incorporation, confirming acts, acts which though public in form are of a private nature, and all public laws except such as by particular provision and this title are continued in force, are repealed."

The respondents urge that the act in question is public both in form and nature and therefore is not saved by any of the foregoing exceptions.

After the close of each session of the legislature the secretary of the state has given notice to the public of the acts passed by publishing a part of them in one pamphlet as "public acts," and a part in another pamphlet as "private acts and resolutions." The act before us, passed in 1872, was published in the pamphlet of private acts and resolutions for that year. This classification, it is true, was that of the secretary and not of the legislature; but there the public found it, and overlooking the distinctions between acts public in form but of a private nature, and acts public in form but of a special nature, came to regard and speak of this as private; and presumably the legislature of 1875, the members of which were of this public, intended to include it in, and save it under the description of, "acts which though public in form are of a private nature." Indeed the same legislature, in section 19, page 438, of the revision of 1875, provided that "the private or special acts of this state shall be legal

evidence, and the courts shall take judicial notice of them;" seeming to use the terms "private" and "special" as having the same general signification.

The legislature of 1869 had passed an act entitled "an act to prevent and remove nuisances and obstructions from the channel of Mill River." This channel is a part of the harbor of New Haven, and the act is essentially of the same nature as the one in question; but the same secretary saw fit to publish it in the pamphlet of public acts for that year, and there the public found it, and, still disregarding distinctions, had come to regard this as a public act. But the legislature of 1875 declares that though public in form it is either local or private in its nature, and in the sixth section protects it by special mention from any assertion even that the general words, "all public laws," in the first section had repealed it. The act in question, that of 1872, never having been printed with the public acts, and always having been regarded as private in nature, stood in no need of such mention for its protection. The legislature recognizing the fact that the general understanding as to what laws are public and what are private is mainly the result of the official declarations made by the secretary from year to year, adapted certain expressions both in the first and in the sixth sections to this popular idea.

We think that the act in question has not been repealed.

We advise the Superior Court to grant the injunction.

In this opinion the other judges concurred.