PORT CLINTON ASSOCIATES ET AL. *v.* BOARD OF SELECTMEN OF THE TOWN OF CLINTON ET AL. (14115)

PETERS, C. J., SHEA, CALLAHAN, GLASS and HULL, Js.

Argued December 13, 1990—decision released February 26, 1991

*Roger Sullivan,* for the appellants (plaintiffs).

*Paul D. Meade,* with whom was *W. Campbell Hudson III,* for the appellees (named defendants et al.).

SHEA, J. The plaintiffs, Port Clinton Associates and Port Clinton Marina, Inc.[1] (Port Clinton), wanted to expand their docks further into Clinton Harbor so that they could add fifty-seven boat slips to their seventy-two slip marina. Their goal was frustrated, however, when the Clinton board of selectmen (board), acting pursuant to a town ordinance regulating building lines in Clinton waterways, denied permission for the expansion. Port Clinton sought relief in the Superior Court. In its final form, their challenge to the board's decision alleged, inter alia, an illegal "taking" under the fifth and fourteenth amendments to the United States constitution, and violations of 42 U.S.C. § 1983 (predicated upon the unconstitutional taking). The trial court dismissed these claims for lack of subject matter jurisdiction because it concluded that the board's action would not be "final" enough to give rise to a taking unless Port Clinton first pursued and lost an administrative appeal. In this appeal, we must decide whether the administrative decision at issue was sufficiently "final" to allow the trial court to consider the merits of Port Clinton's claims. We do not agree with the trial court that Port Clinton was required to pursue a statutory appeal before bringing its § 1983 claim, but conclude that in this case Port Clinton did not allege sufficient "finality" to support either its taking or its § 1983 claim. Accordingly, we affirm the judgment of the trial court dismissing the complaint.

Since this case is about procedure, a review of its procedural history is appropriate. The following facts are

---

[1] Port Clinton Associates owns the land and the marina built onto the land that are the subject of this appeal. Port Clinton Marina, Inc., leases the marina from Port Clinton Associates and runs the marina business.

not in dispute.[2] Prior to 1985, Port Clinton owned and operated a seventy-two slip marina. The marina was composed of three piers, each extending approximately two hundred feet into the Hammonassett River near the elbow where the Hammonassett and Indian Rivers flow into Clinton Harbor. In early 1985, Port Clinton applied to the U. S. Army Corps of Engineers (Army Corps), which is responsible for regulating navigable waters of the United States; *United States* v. *Cherokee Nation of Oklahoma*, 480 U.S. 700, 107 S. Ct. 1487, 94 L. Ed. 2d 704 (1987); 33 U.S.C. § 403 (§ 10 of the Rivers and Harbors Appropriations Act of 1899); 33 C.F.R. § 322.1 et seq.; for permission to extend two of the marina's piers by approximately two hundred fifty feet, thereby adding fifty-seven boat slips to the marina.[3] Port Clinton sought a similar permit from the Connecticut department of environmental protection (DEP), which has concurrent jurisdiction with the Army Corps over waters within Connecticut boundaries. 33 C.F.R. § 322.1; *Cummings* v. *Chicago*, 188 U.S. 410, 430, 23 S. Ct. 472, 47 L. Ed. 525 (1903). The DEP granted the permit, which by its terms was subject to the possible existence of local ordinances or regulations.[4] The Army Corps denied the permit application because Port Clinton had not obtained local approval.[5]

---

[2] The trial court's memorandum of decision set forth few facts. The record, however, contains permit applications, maps, agency correspondence and other supporting documents. The facts set forth herein are intended to summarize this undisputed documentary evidence, not to express any conclusion regarding possible inferences to be drawn from that evidence.

[3] See Appendix to this opinion.

[4] The DEP's "Certificate of Authorization," dated December 10, 1985, stated: "This permit is subject to and does not derogate any present or future property rights or powers of the State of Connecticut, and conveys no property rights in real estate or material nor any exclusive privileges, and is further subject to any and all public and private rights and to any federal, state or local laws or regulations pertinent to the property or activity affected hereby."

[5] The Army Corps of Engineers advised Port Clinton by letter dated June 19, 1986: "Pursuant to Federal Regulations, Title 33 CFR Part

After the Army Corps denied its permit application, Port Clinton applied to the board of selectmen for local permission, pursuant to "An Ordinance Establishing Building Lines in Certain Clinton Waterways."[6] The

320.4 (j) (1), 'if a required Federal, State and/or local certification and/or authorization has been denied for activities which also require a Department of the Army Permit, the Army Permit will be denied without prejudice to the right of the applicant to reinstate processing of the application if subsequent approval is received from the appropriate Federal, State and/or local agency.' "

[6] "AN ORDINANCE ESTABLISHING BUILDING LINES IN CERTAIN CLINTON WATERWAYS

1. Pursuant to Section 7-147 of the Connecticut General Statutes, as amended the Waterway lines hereinafter described are hereby established for the purposes of conserving and preserving the water resources of Clinton Harbor, Hammonassett River and Long Island Sound, and for all other lawful purposes.

2. The Waterway Lines are those delineated on a map entitled 'TOWN OF CLINTON ESTABLISHMENT OF HARBOR LINES' as prepared by Flaherty-Giavara and Associates Environmental Design Consultants, 158 Bull Hill Lane, West Haven, Conn., Scale 1″ = 200′ dated 20th September, 1972, as shown on four (4) drawings, which map is hereby incorporated in, and made a part of, this Ordinance.

3. No private person or firm or corporation shall hereafter place any permanent obstruction or encroachment seaward of, or beyond, (in the direction of the waterway), the Waterway Lines, without the written permission of the Clinton Board of Selectmen.

4. Any person, firm or corporation, desiring such permission, shall make written application therefor to the Board of Selectmen. Such application shall contain complete details of, and a map of, the proposed obstruction or encroachment and showing its relationship to the Waterway Lines. Such map shall be a Class A-2 survey and shall be certified by a Licensed Surveyor or Professional Engineer.

5. The Board of Selectmen shall refer such application to the Clinton Harbor Commission for its recommendations. The Harbor Commission may, at its discretion, hold a public hearing on such application, and, shall submit its report and recommendation to the Board of Selectmen within 60 days after referral to the Commission.

6. Within 90 days after its receipt of an application for permission the Board of Selectmen shall grant or deny permission, in writing.

7. Any person, firm or corporation, in violation of this ordinance shall, upon conviction thereof, be fined not more than $100. for each day of such violation.

Port Clinton Associates *v.* Board of Selectmen

town had enacted the ordinance "[p]ursuant to Section 7-147 of the Connecticut General Statutes."[7] The ordinance required anyone planning construction that would extend beyond the established building lines (approximately one hundred feet off shore) to seek permission from the board. Pursuant to the ordinance, the board referred the application to the Clinton harbor

8. The Board of Selectmen shall take all appropriate action in the Courts to restrain and/or eliminate any violation of this ordinance.

9. The invalidity of any provisions of this ordinance shall not [a]ffect the validity of the remainder.

10. This ordinance shall be effective at 12:05 o'clock on the 18th Nov. 1972."

[7] Prior to 1988, General Statutes § 7-147 provided: "PROHIBITION OF OBSTRUCTIONS IN WATERWAYS. Any town, city or borough may, within its jurisdiction, establish by ordinance lines along any part of any waterway beyond which, in the direction of the waterway, no permanent obstruction or encroachment shall be placed by any private person or any firm or corporation, unless permission is granted in writing by the legislative body of the town, city or borough. Wherever there is a city or borough within a town, the town shall have authority to establish such lines for such of its area as is not within such city or borough, and the city or borough shall have such authority within its boundaries. Any two or more adjoining municipalities shall have authority to investigate jointly the desirability of establishing lines on either or both sides of a waterway within their jurisdiction. Any private person or any firm or corporation aggrieved by any decision of a legislative body made in accordance with this section may, within thirty days after notice thereof, appeal from such decision in the manner provided by section 8-8 for appeal from the decisions of a municipal zoning board of appeals. Nothing contained in this section shall limit or restrict the commissioner of transportation in exercising his authority over the harbors and navigable waters of the state, nor apply to any dam, bridge, pipeline or other similar structure, and appurtenances thereto, extending across any waterway, which are otherwise in compliance with law."

The statute was extensively amended by Public Acts 1988, No. 88-327, §§ 1, 3, after the Superior Court found the statute to be unconstitutionally vague. *Bottone* v. *Westport,* Superior Court, judicial district of Stamford-Norwalk, Docket No. CV87-0085097 (January 12, 1988); 3 Conn. Super. Ct. Reports 160, 163 (1988). Subsequently, as discussed infra, the Supreme Court reversed that decision and found the statute to be constitutionally sound when read to require a town to prescribe by ordinance the process for exceptions instead of leaving exceptions to be "decided on an ad hoc basis at the whim of the local legislative body." *Bottone* v. *Westport,* 209 Conn. 652, 672, 553 A.2d 576 (1989).

commission, which held a public hearing and then recommended denial of the application.

The board issued a memorandum of decision denying Port Clinton's application. In its decision, the board first noted the purposes and standards set forth in the ordinance, " 'conserving and preserving' the water resources of Clinton Harbor and other waterways." It then refused permission on the basis of "evidence indicat[ing] that the proposed expansion would have a negative impact on safety, both in the harbor and on shore and that it could cause harm to the environmental quality of the harbor and its water resources. Both the expansion of the docking facilities further out into the harbor and the resulting increase in the intensity of onshore activities could lead to further crowding, congestion, and pollution."

Port Clinton did not resubmit a revised application. Instead, pursuant to § 7-147, it filed an administrative appeal in the manner prescribed by General Statutes § 8-8,[8] claiming, inter alia, that the ordinance itself con-

---

[8] General Statutes (Rev. to 1985) § 8-8 provides in pertinent part: "APPEAL FROM BOARD TO COURT. REVIEW BY APPELLATE COURT. (a) Any person or persons severally or jointly aggrieved by any decision of said board, or any person owning land which abuts or is within a radius of one hundred feet of any portion of the land involved in any decision of said board, or any officer, department, board or bureau of any municipality, charged with the enforcement of any order, requirement or decision of said board, may, within fifteen days from the date when notice of such decision was published in a newspaper pursuant to the provisions of section 8-3 or 8-7, as the case may be, take an appeal to the superior court for the judicial district in which such municipality is located, which appeal shall be made returnable to said court in the same manner as that prescribed for civil actions brought to said court. . . . "

"(e) The court, upon an appeal taken under subsection (a) of this section, shall review the proceedings of said board and shall allow any party to such appeal to introduce evidence in addition to the contents of the record of the case returned by said board if the record does not contain a complete transcript of the entire proceedings before said board, including all evidence presented to it, pursuant to section 8-7a, or if, upon the hearing upon such appeal, it appears to the court that additional testimony is necessary for

stituted an unconstitutional taking and was preempted by state regulation. In the course of the ensuing procedural skirmishes, Port Clinton added counts charging, inter alia, that: (1) both § 7-147 and the ordinance were unconstitutionally vague; (2) the ordinance was invalid because it was improperly adopted, exceeded the town's geographical jurisdiction, and was preempted by and conflicted with various statutes; and (3) the board's decision constituted an unconstitutional taking and therefore violated 42 U.S.C. § 1983. In its final version, Port Clinton's revised amended complaint contained these counts and eliminated the administrative appeal.[9]

---

the equitable disposition of the appeal. The court may take such evidence or appoint a referee or committee to take such evidence as it directs and report the same to the court, with his or its findings of facts and conclusions of law, which report shall constitute a part of the proceedings upon which the determination of the court shall be made.

"(f) The court, upon an appeal taken under subsection (a) of this section and after a hearing thereon, may reverse or affirm, wholly or partly, or may modify or revise the decision appealed from. Costs shall be allowed against said board if the decision appealed from is reversed, affirmed in part, modified or revised. Appeals from decisions of said board shall be privileged cases to be heard by the court, unless cause is shown to the contrary, as soon after the return days as is praticable.

"(g) There shall be no right to further review except to the appellate court by certification for review, upon the vote of two judges of the appellate court so to certify and under such other rules as the judges of the appellate court establish. The procedure on such appeal to the appellate court shall, except as otherwise provided herein, be in accordance with the procedures provided by rule or law for the appeal of judgments rendered by the superior court unless modified by rule of the judges of the appellate court. . . ."

[9] Originally, Port Clinton named the board of selectmen as defendants. Subsequently, on September 3, 1986, Port Clinton cited in as parties defendant individual members of the board of selectmen, namely, Virginia D. Zawoy, Margery C. Scully, Patricia A. Swaun, Miguel A. Escalera and Edward A. Miller III. The motion to cite in was granted September 22, 1986. These defendants were named in the revised amended complaint dated December 7, 1988, and have joined the board's briefs on appeal. On December 21, 1987, the court ordered that the state of Connecticut and the commissioner of environmental protection be added as parties defendant; these defendants, although not named in the revised amended complaint of Decem-

In the interim between the filing of the original complaint and rendition of the judgment of dismissal, a trial court in an unrelated case, *Bottone* v. *Westport,* Superior Court, judicial district of Stamford-Norwalk, Docket No. CV87-0085097 (January 12, 1988), found § 7-147 to be unconstitutionally vague.[10] The legislature then amended the statute, effective June 3, 1988, thereby repealing the statutory authority for the ordinance. See Public Acts 1988, No. 88-327. The town therefore repealed its ordinance effective November 14, 1989.

Port Clinton filed a motion for summary judgment on September 9, 1988, which the trial court denied on April 27, 1989. In its decision, the court appeared to reject the taking and § 1983 claims as a matter of law, but it left for trial the question of the ordinance's validity in light of the factual dispute over the town's geographical jurisdiction. Thereafter, on August 2, 1989, the board filed its own motion for summary judgment. Instead of ruling on that motion, the court, in a decision dated January 31, 1990, dismissed the case suo motu for lack of subject matter jurisdiction because (1) the challenges to the ordinance and statute were moot, and (2) the other claims were predicated upon a "taking" by an agency decision that would not be "final" until the statutory appeal process, which Port

ber 7, 1988, did file answers on August 31 and September 25, 1989, respectively. In their answers, the state and the commissioner agreed with Port Clinton's assertion that the town's ordinance exceeded the statutory authorization under General Statutes § 7-147 and was preempted by state regulation. Neither the state nor the commissioner has filed a brief or otherwise participated in the appeal, presumably because the disputed ordinance has been repealed. Throughout this opinion, the terms "defendants" and "the board" refer collectively to the board of selectmen and the individual board member defendants.

[10] Reversing the trial court's decision, we held the statute to be constitutional as construed by this court. *Bottone* v. *Westport,* 209 Conn. 652, 553 A.2d 576 (1989); see footnote 7, supra.

Clinton had originally commenced but later abandoned, was complete. On appeal, Port Clinton appears to challenge only the trial court's second conclusion by stating the issue to be: "Whether the plaintiff's abandonment of an administrative appeal in favor of a direct challenge to the validity of a harbor building lines ordinance and its enabling statutory authority, together with claims for a 'taking' in violation of 42 U.S.C. § 1983 or inverse condemnation, deprived the court of subject matter jurisdiction to hear or determine the 'taking' claims."

I

The cornerstone of Port Clinton's complaint is its taking claim.[11] As a result of the board's refusal to grant Port Clinton permission to build, it was unable, in 1986, to add the planned fifty-seven boat slips to its dock. That claimed injury would seem to have terminated on November 23, 1989, when the ordinance was repealed. Port Clinton claims, nevertheless, that, because the Army Corps of Engineers changed its own permit requirements in the intervening four years, Port Clinton may no longer build the number of boat slips originally planned. If it had received permission from the town or not been required to seek it in 1986, the boat slips would have been built before the federal rule change and the marina expansion would not have been affected.

To evaluate these claims, we must first understand what "property" Port Clinton claims has been taken.[12]

---

[11] Port Clinton's substantive and procedural due process claims were also dismissed by the trial court because they were directed toward the repealed ordinance and were therefore also moot.

[12] The fifth amendment to the United States constitution provides: "nor shall private property be taken for public use, without just compensation." The constitution of Connecticut, article first, § 11, provides: "The property of no person shall be taken for public use, without just compensation therefor." Port Clinton has offered no separate analysis under the Con-

Port Clinton owns land abutting navigable waters, specifically, the Hammonassett River. According to Connecticut common law, ownership of such land, termed "upland," extends to the high water mark on the shore. *Lane* v. *Harbor Commissioners,* 70 Conn. 685, 694, 40 A. 1058 (1898). In addition, the owner of upland has certain rights to use the land between high and low water mark and the waters extending therefrom to the point where they become navigable. See *Shorehaven Golf Club, Inc.* v. *Water Resources Commission,* 146 Conn. 619, 624, 153 A.2d 444 (1959). These rights are termed "riparian rights." Riparian rights derive from ownership of the upland from which the waters extend; *Shorefront Park Improvement Assn., Inc.* v. *King,* 157 Conn. 249, 257–58, 253 A.2d 29 (1968); but may be separately alienated. *Shorehaven Golf Club, Inc.* v. *Water Resources Commission,* supra; *State* v. *Knowles-Lombard Co.,* 122 Conn. 263, 265, 188 A. 275 (1936).

Although riparian rights are in fact "property"; *Shorehaven Golf Club, Inc.* v. *Water Resources Commission,* supra; *Simons* v. *French,* 25 Conn. 346, 353 (1856); rather than simply "rights" that constitute elements of ownership; see *Keystone Bituminous Coal Assn.* v. *DeBenedictis,* 480 U.S. 470, 497, 107 S. Ct. 1232, 94 L. Ed. 2d 472 (1987); they are so limited by superior public rights that they are often referred to as a mere "franchise." *East Haven* v. *Hemingway,* 7 Conn. 186, 202 (1828). Thus, "[a] riparian proprietor whose land is bounded by a navigable stream has certain rights, as such, among which, in the language of Mr. Justice Miller, are 'access to the navigable part of the river from the front of his lot, the right to make a landing, wharf or pier for his own use or for the use

---

necticut constitution and we therefore do not address its application to the takings claim. *Hayes* v. *Smith,* 194 Conn. 52, 480 A.2d 425 (1984). Port Clinton's claim under 42 U.S.C. § 1983 is, of course, directed to the deprivation of rights under the federal constitution.

of the public, subject to such general rules and regulations as the legislature may see proper to impose for the protection of the rights of the public, whatever those rights may be.' *Yates* v. *Milwaukee,* [77 U.S. (10 Wall.) 497, 504 [1870]." *New York, New Haven & Hartford R. Co.* v. *Long,* 72 Conn. 10, 21, 43 A. 559 (1899); accord *Walz* v. *Bennett,* 95 Conn. 537, 542, 111 A. 834 (1920); *Orange* v. *Resnick,* 94 Conn. 573, 578, 109 A. 864 (1920); *Lane* v. *Harbor Commissioners,* supra, 694; *Farist Steel Co.* v. *Bridgeport,* 60 Conn. 278, 283, 22 A. 561 (1891); *State* v. *Sargent,* 45 Conn. 358, 373 (1877). The owner of riparian rights, like Port Clinton, has the right to build a pier or wharf past the low water mark " 'subject to the qualification that he thereby does no injury to the free navigation of the water by the public.' " *Prior* v. *Swartz,* 62 Conn. 132, 138, 25 A. 398 (1892), quoting *Mather* v. *Chapman,* 40 Conn. 382, 395 (1873).

It is undisputed that Port Clinton has already built docks into the water off its upland. Port Clinton therefore has already made some use of its riparian property or rights but not to its outer limit, namely, the navigable channel. See *Lane* v. *Harbor Commissioners,* supra.[13] Thus, the property allegedly "taken" can be

---

[13] The right to wharf out derives from the right of access to "navigable" or "deep" water. 1 H. P. Farnham, Water and Water Rights § 62. For that reason, "as soon as the point of navigability is reached, the purpose of the pier is fulfilled, and the right to construct it ceases at that point. *Illinois Central Railroad Company* v. *Illinois,* 146 U.S. 387, 13 S. Ct. 110, 36 L. Ed. 1018 [1892]." Id., § 111, p. 522; accord *Lane* v. *Harbor Commissioners,* 70 Conn. 685, 40 A. 1058 (1898). Both Port Clinton and the board appear to have implicitly assumed throughout this litigation that Port Clinton's right to wharf out extends as far as the federal channel designated by the United States government and mapped out in Port Clinton's proposal. See Appendix. The board has argued that because this right to wharf out is subject to the public's superior right of navigation, its deprivation cannot be a "taking," but has not claimed that Port Clinton had no right whatever to expand its dock. See *Lane* v. *Harbor Commissioners,* supra. We shall assume, therefore, for purposes of this opinion only, that Port Clinton had

no more than the right to extend an existing dock as far as the federal channel if public regulations protecting free navigation so permit and if the public's right to free navigation will not be impeded thereby. See *Scranton* v. *Wheeler,* 179 U.S. 141, 163, 21 S. Ct. 48, 45 L. Ed. 126 (1900); cf. *United States* v. *Chandler-Dunbar Water Power Co.,* 229 U.S. 53, 70, 33 S. Ct. 667, 57 L. Ed. 1063 (1913).

## II

The trial court, presented with Port Clinton's claim that a portion of its limited riparian rights had been taken by an unconstitutional and invalid ordinance in violation of 42 U.S.C. § 1983, dismissed the complaint suo motu for lack of subject matter jurisdiction. Port Clinton contends that the trial court improperly relied upon the doctrine of exhaustion of remedies in dismissing the taking and § 1983 claims.

While we agree with Port Clinton that federal law prevents us from applying the exhaustion doctrine to a § 1983 claim; *Patsy* v. *Board of Regents,* 457 U.S. 496, 102 S. Ct. 2557, 73 L. Ed. 2d 172 (1982); we do not agree that the trial court ultimately reached its decision on the basis of that doctrine. Rather, we read the memorandum of decision as later amplified[14] to rely on the well established principle that there can be no regulatory "taking," and thus no deprivation of "private property without just compensation," until there has been a final administrative decision. See *Williamson County Regional Planning Commission* v. *Hamilton Bank,* 473 U.S. 172, 192, 105 S. Ct. 3108, 87 L. Ed. 2d 126 (1985).

---

the right to wharf out until it reached the federal channel so long as its exercise of that right did not interfere with the public's superior right of navigation.

[14] The trial court further articulated its decision on June 20, 1990, in a memorandum of decision denying Port Clinton's "motion to vacate or set aside judgment of dismissal" dated March 7, 1990.

The reason for the "finality" principle is set forth in *MacDonald, Sommer & Frates* v. *Yolo County,* 477 U.S. 340, 106 S. Ct. 2561, 91 L. Ed. 2d 285 (1986). "The regulatory taking claim advanced by appellant has two components. First, appellant must establish that the regulation has in substance 'taken' his property—that is, that the regulation 'goes too far.' . . . Second, appellant must demonstrate that any proffered compensation is not 'just.' . . . It follows from the nature of a regulatory taking claim that an essential prerequisite to its assertion is a final and authoritative determination of the type and intensity of development legally permitted on the subject property. A court cannot determine whether a regulation has gone 'too far' unless it knows how far the regulation goes. . . . Until a property owner has 'obtained a final decision regarding the application of the zoning ordinance and subdivision regulations to its property,' 'it is impossible to tell whether the land retain[s] any reasonable beneficial use or whether [existing] expectation interests ha[ve] been destroyed.' " (Citations omitted.) Id., 348–49.

## A

Finality is required when the claim is made that a valid regulation has gone "too far." In this case, however, Port Clinton has charged that the regulation *itself* was invalid and therefore that its "adoption and application" to Port Clinton caused a temporary taking without regard to the extent of loss caused. When the regulation itself is not a "valid" exercise of the police power, United States Supreme Court precedents imply that no matter how "far" it goes, the regulation may constitute a taking. See *Penn Central Transportation Co.* v. *New York City,* 438 U.S. 104, 127, 98 S. Ct. 2646, 57 L. Ed. 2d 631, reh. denied, 439 U.S. 883, 99 S. Ct. 226, 58 L. Ed. 2d 198 (1978); *Goldblatt* v. *Hempstead,* 369 U.S. 590, 592–93, 82 S. Ct. 987, 8 L. Ed. 2d 130

(1962); *Nectow* v. *Cambridge,* 277 U.S. 183, 188, 48 S.
Ct. 447, 72 L. Ed. 842 (1928); cf. *Corthouts* v. *Newing-
ton,* 140 Conn. 284, 99 A.2d 112 (1953).

We conclude, however, that Port Clinton was
nevertheless required to satisfy the "finality" require-
ment in the sense of showing that "the initial decision-
maker [had] arrived at a definitive position on the issue
that inflict[ed] an actual, concrete injury . . . ." *Wil-
liamson County Regional Planning Commission* v.
*Hamilton Bank,* supra, 193.[15]

We reach this conclusion for two reasons. First, Port
Clinton sought not only invalidation of the regulation,[16]
but compensation for its injury. Until a trial court
knows "how far the regulation goes" it cannot deter-
mine the extent of the injury, or, indeed, be certain that
there is any injury not de minimis in scope.

More importantly, in contending that the ordinance
itself constituted a "per se" taking, Port Clinton did
not charge that the ordinance furthered an improper
purpose, but rather attacked its lack of specificity, its
jurisdictional basis and the method by which it was
enacted.[17] We do not believe that the constitution

[15] The decision of the United States Supreme Court in *First Evangelical
Lutheran Church* v. *Los Angeles County,* 482 U.S. 304, 107 S. Ct. 2378,
96 L. Ed. 2d 250 (1987), does not require us to reach a different conclu-
sion. That case, holding that a property owner is entitled to compensation
for a temporary taking for losses incurred prior to a regulation's repeal,
was expressly limited to situations where the challenged regulation deprives
the owner of *all* use of his property. Id., 321. Moreover, the ordinance in
that case prohibited all construction beyond a specified flood line and did
not provide for special permission to build under any circumstances.

[16] As noted above, Port Clinton has not contested that portion of the trial
court's decision dismissing as moot the count directly challenging the ordi-
nance's validity.

[17] Port Clinton's complaint attacked the ordinance as "a municipal mode
of arbitrarily denying reasonable use of property, confiscating the Plain-
tiffs' property, or arbitrary conduct, abuse of authority, interfering with
the rights of citizens who wish to make recreational use of the coastal waters
and permitting predetermined suppression of property rights." That alle-

requires compensation for any temporary infringement of an owner's property rights, no matter how slight, every time a town makes a mistake in construing an enabling statute or in measuring its geographical boundaries. "Temporary harms in [this category] are an unfortunate but necessary by-product of disputes over the extent of the government's power to inflict permanent harms without paying for them. Every time a property owner is successful, in whole or in part, in a challenge to a governmental regulation—whether it be a zoning ordinance, a health regulation or a traffic law—he is almost certain to suffer some temporary harm in the process. At the least, he will usually incur significant litigation expenses and frequently he will incur substantial revenue losses because the use of his property has been temporarily curtailed while the dispute is being resolved." *Williamson County Regional Planning Commission* v. *Hamilton Bank,* supra, 204 (Stevens, J., concurring). The suggestion in *Penn Central Transportation Co.* and *Goldblatt* that when a regulation is invalid as exceeding the police power, any restriction it imposes on the exercise of property rights may constitute a "taking" should not apply to a case where the only invalidity claimed is procedural and the confiscation claimed is less than total.[18]

---

gation is simply another way of asserting that the ordinance was vague and that it confiscated Port Clinton's riparian rights. The record does not indicate that Port Clinton has argued that the ordinance constituted some kind of invidious discrimination or promoted the private aims of its promulgators or in any other way exceeded the police power to protect and promote the health, safety and general welfare of the public.

[18] While we need not determine what type of invalidity could give rise to a taking no matter "how far" the reach of the regulation, we note Justice Stevens' concurring comment in *Williamson County Regional Planning Commission* v. *Hamilton Bank,* 473 U.S. 172, 202 n.1, 105 S. Ct. 3108, 87 L. Ed. 2d 126 (1985): "For example, even if the State is willing to compensate me, it has no right to appropriate my property because it does not agree with my political or religious views."

## B

Similarly, finality is required even when the claimant does not allege that the challenged regulation deprives him of all reasonable use of the property and constitutes a "practical confiscation"; see *MacDonald, Sommer & Frates* v. *Yolo County,* supra, 349; *Pennsylvania Coal Co.* v. *Mahon,* 260 U.S. 393, 43 S. Ct. 158, 67 L. Ed. 322 (1922); but rather alleges that the "interference with appellants' property is of such a magnitude that 'there must be an exercise of eminent domain and compensation to sustain [it].' " *Penn Central Transportation Co.* v. *New York City,* supra, 136; see also *Keystone Bituminous Coal Assn.* v. *DeBenedictis,* supra. The latter test, often applied to regulatory takings; see, e.g., *Chevron Oil Co.* v. *Zoning Board of Appeals,* 170 Conn. 146, 151, 365 A.2d 387 (1976); *Brecciaroli* v. *Commissioner of Environmental Protection,* 168 Conn. 349, 355–56, 362 A.2d 948 (1975); see generally C. Rose, "*Mahon* Reconstructed: Why the Takings Issue is Still a Muddle," 57 S. Cal. L. Rev. 561 (1984); permits a property owner to claim a partial taking if the public's gain does not outweigh his loss.[19]

Finality is a prerequisite to such a "partial taking" claim just as it is a prerequisite to a "temporary taking" claim. In each case, without a final administrative decision, the reviewing court cannot measure the extent of the injury to the property owner's interests and can neither decide whether a taking has occurred nor calculate the measure of damages. A secondary consideration, of course, is the possibility that pursuit of

---

[19] The test in a facial challenge to a statute is whether the statute " 'denies an owner economically viable use of his land.' " *Hodel* v. *Virginia Surface Mining & Reclamation Assn.,* 452 U.S. 264, 295–96, 101 S. Ct. 2352, 69 L. Ed. 2d 1 (1981), quoting *Agins* v. *Tiburon,* 447 U.S. 255, 260, 100 S. Ct. 2138, 65 L. Ed. 2d 106 (1980). Port Clinton made a facial challenge to the ordinance and also challenged the board's application of the ordinance.

a final administrative resolution will produce a mutually acceptable solution "thereby obviating any need to address the constitutional questions." *Hodel* v. *Virginia Surface Mining & Reclamation Assn.,* 452 U.S. 264, 297, 101 S. Ct. 2352, 69 L. Ed. 2d 1 (1981); cf. *Tenoco Oil Co.* v. *Department of Consumer Affairs,* 876 F.2d 1013, 1026–27 (1st Cir. 1989).

## III

If a property owner has not obtained a final decision from the administrative agency applying the regulation, the reviewing court lacks jurisdiction to rule on a taking claim. The jurisdictional nature of finality derives from its similarity to "ripeness." See *Williamson County Regional Planning Commission* v. *Hamilton Bank,* supra, 185. Thus, the remaining question before us is whether the trial court correctly decided that the board of selectmen's decision was not a "final" decision and thus that the court lacked jurisdiction over the taking claim and the claim under 42 U.S.C. § 1983.

In its memorandum of decision on Port Clinton's motion to vacate or set aside the judgment, the trial court explained its conclusion that lack of finality deprived it of jurisdiction as follows. "The statutory appeal procedure provided a plain and adequate legal remedy, whereby the plaintiffs could have sought to establish the issues of finality and confiscation, as precedents to seeking just compensation. When the plaintiffs withdrew such appeal, they deprived the court of jurisdiction to consider these issues, and rendered the court without power to address the issue of just compensation."

In finding a lack of finality, the trial court reached the right conclusion, but for the wrong reason. The United States Supreme Court, in *Williamson County*

*Regional Planning Commission* v. *Hamilton Bank,* supra, explained what kind of "finality" is a prerequisite to a § 1983 claim predicated upon a taking. "The difference [between the doctrine of exhaustion of administrative remedies, and the finality requirement] is best illustrated by comparing the procedure for seeking a variance with the procedures that, under *Patsy* [v. *Board of Regents*], respondent would not be required to exhaust. While it appears that the State provides procedures by which an aggrieved property owner may seek a declaratory judgment regarding the validity of zoning and planning actions taken by county authorities . . . respondent would not be required to resort to those procedures before bringing its § 1983 action, *because those procedures clearly are remedial.* Similarly, respondent would not be required to appeal the Commission's rejection of the preliminary plat to the Board of Zoning Appeals, because the Board was empowered, at most, to review that rejection, not to participate in the Commission's decisionmaking.

"Resort to those procedures would result in a judgment whether the Commission's actions violated any of respondent's rights. In contrast, resort to the procedure for obtaining variances would result in a conclusive determination by the Commission whether it would allow respondent to develop the subdivision in the manner respondent proposed." (Emphasis added.) Id., 193. The court added: "If the government has provided an adequate process for obtaining compensation, and if resort to that process 'yield[s] just compensation,' then the property owner 'has no claim against the Government' for a taking. . . . [I]f a State provides an adequate procedure for seeking just compensation, the property owner cannot claim a violation of the Just Compensation Clause until it has used the procedure and been denied compensation." Id., 194–95.

Thus, a property owner need not pursue *remedial* procedures that merely review the propriety of the initial decisionmaker's action. A property owner must, however, pursue all available procedures that could result in a decision favorable to some reasonable use of the property. In addition, a property owner must pursue any procedure whereby it can obtain *compensation* for the impact of the regulation upon his use of his property. Precisely what procedures a given property owner must pursue depends upon the specific regulation at issue.

In *Hamilton Bank,* supra, the property owner submitted a subdivision proposal to the local zoning commission. The commission thereafter changed its density requirements so that the original proposal, which had not yet been acted upon, was no longer in conformity with the regulations. The commission denied several revised plans submitted by the developer. The developer then pursued appeals to the county board of zoning appeals, but did not seek variances from the zoning commission. It also did not avail itself of applicable inverse condemnation procedures and did not argue that these procedures were unavailable or inadequate. The United States Supreme Court concluded that in order to show finality, the developer should have (a) sought variances from the zoning commission, and (b) utilized the inverse condemnation procedures available. Id., 193–95.

The regulation at issue in the present case, by contrast, is not a zoning regulation. In Connecticut, if a property owner's plans do not comply with zoning regulations, the owner can seek to bypass certain requirements by obtaining a variance, or, when applicable, by obtaining an exception to permit it to use the property in a manner generally prohibited by the regulations but permitted upon satisfaction of certain conditions. Variances and exceptions in Connecticut are generally

granted not by the zoning commission, but by the zoning board of appeals. General Statutes § 8-6. Thus, in many instances, a final decision by the "initial decisionmaker," really means a decision by the zoning board of appeals, when that body is not acting in a reviewing capacity but is exercising its power to grant variances and exceptions. See *Florentine* v. *Darien,* 142 Conn. 415, 115 A.2d 328 (1955).

By contrast, Port Clinton had no "decisionmaker" other than the board of selectmen itself from which it could have obtained a more favorable result. In 1985, General Statutes § 7-147 provided only that a property owner aggrieved by a decision based on a town harbor line ordinance could pursue an appeal pursuant to General Statutes § 8-8. That statute, however, provides for an administrative appeal to the *Superior Court,* which may review the propriety of the initial decisionmaker's action within the usual limits on judicial review of an agency action. The statutory appeals process under § 8-8 is, thus, precisely the type of procedure that a claimant under 42 U.S.C. § 1983 need *not* pursue as a prerequisite to filing his suit.

Nevertheless, the trial court was correct in holding that Port Clinton failed to demonstrate the finality required. Port Clinton indisputably submitted only *one* proposal to the board of selectmen. We cannot know whether the board would also have rejected a more modest plan. Although we do not believe "that repeated applications and denials are necessary to pinpoint" the board's position; *MacDonald, Sommer & Frates* v. *Yolo County,* supra, 359 (White, J., dissenting); nor that a property owner must "take patently fruitless measures"; id.; in most cases, a property owner must do more than submit one plan to an agency in order to establish that the agency's decision is "final" for the purposes of the taking clause. See, e.g., id. (owner filed one application to subdivide property into 159 lots); *Wil-*

*liamson County Regional Planning Commission* v. *Hamilton Bank,* supra (developer submitted two plats for subdivision); *San Diego Gas & Electric Co.* v. *San Diego,* 450 U.S. 621, 101 S. Ct. 1287, 67 L. Ed. 2d 551 (1981) (company abandoned original plan for nuclear power plant and never submitted for approval new plan for industrial park after city adopted "open space" plan); *Penn Central Transportation Co.* v. *New York City,* supra (company submitted only two proposed plans for building skyscraper atop Grand Central railway terminal); *Luf* v. *Southbury,* 188 Conn. 336, 351, 449 A.2d 1001 (1982) (owner seeking damages to his property value due to lawful discontinuance of an unimproved public highway could not show a taking because "we cannot predict what response the plaintiffs would encounter if they were to present subdivision proposals of their own to the appropriate Southbury authorities"); *Brecciaroli* v. *Commissioner of Environmental Protection,* 168 Conn. 349, 357, 362 A.2d 948 (1975) (plaintiff submitted only one application for a permit to conduct an activity on wetlands); *Shorehaven Golf Club, Inc.* v. *Water Resources Commission,* supra, 625 (owner submitted only one application for the designation of a specific channel from which to excavate gravel).

Port Clinton made no attempt whatever to seek a favorable result on another proposal. "Appellant is thus in the same position Mr. and Mrs. Agins would have occupied if they had requested and been denied the opportunity to build five Victorian mansions for their single-family residences, or if San Diego Gas & Electric Co. had asked and been denied the option of building a nuclear power plant. Rejection of exceedingly grandiose development plans does not logically imply that less ambitious plans will receive similarly unfavorable reviews." *McDonald, Sommer & Frates* v. *Yolo County,* supra, 353 n.9 (referring to *Agins* v. *Tiburon,*

447 U.S. 255, 100 S. Ct. 2138, 65 L. Ed. 2d 106 [1980], and *San Diego Gas & Electric Co.* v. *San Diego,* supra).

Port Clinton's proposed expansion would have more than doubled the existing dock's protrusion into the waters of the Hammonassett River and would have come within fifty feet of the channel.[20] It would have added fifty-seven additional boats to river traffic. One of the reasons the board gave for denying the proposal was to protect the safety of the harbor from crowding and congestion.[21] It is not implausible to conclude that the board might have approved a somewhat less "gran-

[20] See "Proposed Dock in Clinton Harbor" at Appendix.

[21] Since the board's reasons for its decision included the potentially negative impact of the expansion on harbor safety, it is unlikely that Port Clinton could prevail on the merits of its taking claim. Given that Port Clinton's riparian rights are by definition subject to regulation protecting the public's superior right to navigation, the ordinance, whether or not it was preempted by state regulation, could not take from Port Clinton something it did not already have: an absolute right to build a dock as far as the navigable channel. See *Scranton* v. *Wheeler,* 179 U.S. 141, 163, 21 S. Ct. 48, 45 L. Ed. 126 (1900) (total deprivation of a riparian owner's right of access to navigable water was not a taking where the deprivation occurred when the federal government built a pier to improve public navigability); see also *Lane* v. *Harbor Commissioners,* 70 Conn. 685, 694, 40 A. 1058 (1898) (revocation of a harbor commission permit to extend a wharf was not a taking when a new channel brought navigable water to the edge of the existing wharf). Certainly Port Clinton could not demonstrate that it was deprived of all reasonable use of its "property," that is, its riparian rights; it was already exercising those rights, presumably at a profit. "[T]he submission that appellants may establish a 'taking' simply by showing that they have been denied the ability to exploit a property interest they heretofore had believed was available for development is quite simply untenable." *Penn Central Transportation Co.* v. *New York City,* 438 U.S. 104, 130, 98 S. Ct. 2646, 57 L. Ed. 631, reh. denied, 439 U.S. 883, 99 S. Ct. 226, 58 L. Ed. 2d 198 (1978); see *Manor Development Corporation* v. *Conservation Commission,* 180 Conn. 692, 433 A.2d 999 (1980) (commission's denial of proposal for thirty-three lot subdivision and acceptance of twenty-six lot subdivision did not constitute a taking); see also *Samp Mortar Lake Co.* v. *Plan & Zoning Commission,* 155 Conn. 310, 314–15, 231 A.2d 649 (1967) (zone change preventing developer from expanding existing nonconforming industrial uses did not constitute a taking).

diose" proposal—the sort of proposal that, unlike the original proposal, would meet revised Army Corps regulations.

## IV

In *Hamilton Bank,* the United States Supreme Court implicitly approved the respondent's contention that "there is no requirement that a plaintiff exhaust administrative remedies before bringing a § 1983 action. *Patsy* v. *Florida Board of Regents,* [supra]." *Williamson County Regional Planning Commission* v. *Hamilton Bank,* supra, 192. *Hamilton Bank* applied that proposition only to a § 1983 claim that was based on an alleged taking, not to a pure taking claim, i.e., one brought without reference to § 1983.

While we have used similar reasoning in addressing a pure taking claim; see *Florentine* v. *Darien,* supra; we need not decide whether one making such a claim is never required to pursue procedures that provide review of the legality of an initial decision but cannot themselves result in a decision allowing an owner some reasonable use of his property or award just compensation for deprivation of reasonable use of the property. For the same reasons given above, whether or not Port Clinton would be required to exhaust the statutory appeals process before presenting its pure taking claim outside the § 1983 context, we conclude that the trial court had no jurisdiction to consider the taking claim until Port Clinton obtained a final decision from the board of selectmen as to the amount of expansion it would permit.

The judgment is affirmed.

In this opinion the other justices concurred.

*(See Appendix on following page.)*

# Appendix