Edmund L. Shea, J.
This is a proceeding pursuant to section 817 of the Executive Law and CPLR article 78 to have a determination of respondents reviewed and modified or rescinded. Respondents move both to dismiss the complaint pursuant to CPLR 7804 (subd [f]) and CPLR 3211 (subd [a], par 7), and for summary judgment on undisputed facts pursuant to CPLR 3211 (subd [c]).
Petitioners are the owners of a parcel of land consisting of 39.15 acres which is a peninsula on the easterly side of Oseetah. Lake, with a shoreline of approximately 3,900 feet, located in the Town of Harrietstown, New York. Oseetah Lake is part of the watercourse of the Saranac River lying between *65 Lake Flower upon which the Village of Saranac Lake is located, and is connected with Kiwassa Lake and State locks leading to Lower Saranac Lake. This waterway is a well-known and much traveled pleasure boat route, and petitioners’ penninsula extends close to the main channel.
Petitioners, desiring to develop their property, applied to the Adirondack Park Agency pursuant to section 809 of the Executive Law for permission to develop 32 lots, of which 17 would front on Oseetah Lake. The project was approved by the agency, subject to certain terms and conditions, including: "No boat houses shall be constructed on the shore of Oseetah Lake. Any dock that may be constructed shall be of a type and size that is compatible with the existing rustic shoreline of this portion of the lake.”
Upon reconsideration, this provision was adhered to by the agency and petitioners commenced this proceeding objecting to the prohibition of boathouses.
The ultimate contentions of petitioners may be summarized to the effect that the act of respondents in administering the Adirondack Park Agency Act and prohibiting the construction of boathouses on petitioners’ project was arbitrary, capricious, discriminatory, unreasonable, unlawful and unconstitutional.
Respondents frankly argue in support of their prohibiting the boathouses on the basis of aesthetic, scenic and visual considerations. Although it is noted that at the meeting of the agency where one of the employees suggested the possibility of restricting boathouses to the bay areas of the project site and proscribing them only from the point of the penninsula, one of the members of the agency pointed out the bay areas were more likely to be environmentally sensitive due to shallow depths and the importance of littoral weed beds to fish population. Respondents, in their arguments, placed no reliance on this aspect.
There does not appear to be any material dispute as to the basic facts, although petitioners claim there are a few more structures, including boat sheds near petitioners’ property, which are not shown or are unfairly depicted in respondents’ exhibits.
Certainly the most ambitious attempt of the State Legislature yet to control the use of land was the creation of the Adirondack Park Agency. The Adirondack Park consists of 6,000,000 acres of land, some owned publicly, but intermixed with the majority consisting of privately owned parcels. The *66 whole area is approximately the size of the State of Vermont. It is obvious from reading the Adirondack Park Agency Act that one of the prime concerns of the Legislature was to preserve the aesthetic and scenic value of the park. Thus the lengthy statement of legislative findings and purposes (Executive Law, § 801) includes: "The Adirondack park is abundant in natural resources and open space unique to New York and the eastern United States. The wild forest, water, wildlife and aesthetic resources of the park, and its open space character, provide an outdoor recreational experience of national and international significance. Growing population, advancing technology and an expanding economy are focusing ever-increasing pressures on these priceless resources” and: "The basic purpose of this article is to insure optimum overall conservation, protection, preservation, development and use of the unique scenic, aesthetic, wildlife, recreational, open space, historic, ecological and natural resources of the Adirondack park.”
Guidelines for moderate intensity use areas, which include the area in which petitioners’ property is located, and which petitioners point out include as one of the compatible uses hunting and fishing cabins and hunting and fishing and other private club structures, and . as a secondary use include marinas, boatyards and boat launch sites as set forth in subdivision 4 of section 805 of the Executive Law, which provides, in part: "Development considerations. The following are those factors which relate to potential for adverse impact upon the park’s natural, scenic, aesthetic, ecological, wildlife, historic, recreational or open space resources and which shall be considered, as provided in this article, before any significant new land use or development or subdivision of land is undertaken in the park. * * * (7) Aesthetics (a) Scenic vistas, (b) Natural and man-made travel corridors.”
Subdivision 10 of section 809 of the Executive Law provides: "The agency shall not approve any project * * * or grant a permit therefor, unless it first determines that such project meets the following criteria * * * (e) The project would not have an undue adverse impact upon the natural, scenic, aesthetic, ecological, wildlife, historic, recreational or open space resources of the park.”
It also provides in subdivision 13: "The agency shall have authority to impose such requirements and conditions with its *67 granting of a permit as are allowable within the proper exercise of the police power.”
The section dealing with shoreline restrictions (Executive Law, § 806) provides, in part: "1. In order to provide adequate protection of the quality of the lakes, ponds, rivers and streams of the park and the visual qualities of their shorelines, no person shall undertake any new land use or development or subdivision of land that involves any shoreline within the park, except in compliance, at a minimum, with the following restrictions * * * (2) The minimum setback of all principal buildings and accessory structures in excess of one hundred square feet, other than docks or boathouses, from the mean high-water mark shall be fifty feet in hamlet areas and moderate intensity areas”.
This latter section is construed by petitioners as clearly contemplating that boathouses would be allowed on lake front property.
However reluctant courts have been in the past to allow aesthetic considerations alone to justify the use of police power, beginning with People v Stover (12 NY2d 462, app dsmd 375 US 42), the courts now recognize aesthetics as a legitimate concept within the general police powers. In People v Stover (supra) the court sustained an ordinance banning all clotheslines in front yards because it promoted aesthetic values. Frank recognition of the aesthetic purpose of a zoning ordinance is clearly expressed in Matter of Cromwell v Ferrier (19 NY2d 263) where the Court of Appeals observed that the primary purpose of an antibillboard ordinance is aesthetic and sustained a sign ordinance on that basis. The court in both Stover and Cromwell qualified its opinions by noting that not every aesthetic purpose would support a prohibition of use. In People v Goodman (31 NY2d 262), the court, in upholding a ban on all commercial signs in an area of more than four square feet, stated (p 265): "It is now settled that aesthetics is a valid subject of legislative concern and that reasonable legislation designed to promote the governmental interest in preserving the appearance of the community represents a valid and permissible exercise of the police power.”
The court (p 266) was careful to point out, though, that: "Indeed, regulation in the name of aesthetics must bear substantially on the economic, social and cultural patterns of the community or district.”
Significantly, the community setting was decided by the *68 court as sufficient justification for the restrictions on private property where that restriction was designed solely to enhance the village’s appearance. It was stated: "In creating the Fire Island National Seashore, the Congress recognized special cultural values and national resources of the area and acted to conserve and reserve for future generations the relatively unspoiled and undeveloped beaches, dunes and other resources within Suffolk County.”
This case establishes that aesthetic considerations alone generate a sufficient impact on the public welfare to warrant an exercise of the police power where such considerations relate to unique features of the locality. Although much larger in size than Fire Island, the Adirondack Park, as recognized by the Legislature, also represents a unique and natural area.
Having determined that aesthetic considerations are not unlawful per se, and that the agency has authority to implement the legislative intent by imposing reasonable requirements and conditions respecting the use of the land in granting a permit (Executive Law, § 809, subd 13), it is necessary to determine whether the administrative action of the agency was arbitrary or capricious or an abuse of discretion. (CPLR 7803, subd 3.)
It appears from the exhibits, and especially from the enlarged photographic panorama mosaics, that the shorelines of Oseetah Lake are relatively undeveloped and in a relatively pristine state in the vicinity of petitioners’ property. It can be seen that the view from the main channel, which passes close by petitioners’ property, still retains a scenic view of the trees and shoreline unspoiled by over-development. Furthermore, at the time of the application the Saranac River was under study for inclusion in the Wild, Scenic and Recreational Rivers System (ECL, 15-2715, subd 2, par [aa]). Assuming its designation as a recreational river, the agency would be directed to preserve and restore the natural scenic and recreational qualities of such river (ECL 15-2707), and the agency could take this into consideration.* It must be concluded that the addition of a cluster of boathouses on a project of this size and in this location would tend to destroy the natural beauty of the area, and that the agency’s decision cannot be deemed arbitrary or unreasonable.
*69 Merely because boathouses are not subject to the setback restrictions in section 806 of the Executive Law does not mean that boathouses may not be prohibited, especially in a project involving the number of lots proposed to be developed by petitioners; nor have petitioners demonstrated any unreasonable discriminatory practices by the agency. The agency is required to make its decisions on a case basis taking into consideration all the factors such as location and the number of buildings involved.
Lastly, having determined that the Adirondack Park Agency Act and the actions of the agency are properly within the police powers, petitioners may not be heard to complain that the results constitute an unlawful and unreasonable restriction in use and enjoyment of their property. (Euclid v Ambler Co., 272 US 365.) Almost all zoning laws result in a curtailment of the use of one’s property, but such restrictions are permissible to promote the general welfare. (See, e.g., Friedland v Diamond, 67 Misc 2d 642; Paterson v University of State of N. Y., 40 Misc 2d 1023.)
Respondents’ motion to dismiss the petitioners’ complaint and for summary judgment is granted.

 The court understands that indeed the Governor has signed the 1975 legislative act which includes a designation of that part of the Saranac River, including Oseetah Lake as a recreational river.