******************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.
******************************************

APPENDIX

ROBERT H. LAWRENCE, JR. *v.* DEPARTMENT
OF ENERGY AND ENVIRONMENTAL
PROTECTION*

Superior Court, Land Use Litigation Docket at Hartford
File No. LND CV-15-6066232-S

Memorandum filed July 18, 2016

*Proceedings*

Memorandum of decision on plaintiff's appeal from final decision by defendant approving application to construct residential dock and pier. *Appeal dismissed.*

*James R. Fogarty*, for the plaintiff.

*Sharon M. Seligman*, assistant attorney general, and *George Jepsen*, attorney general, for the defendant.

*John P. Casey* and *Evan J. Seeman*, for the intervening defendant, 16 Highgate Road, LLC.

*Opinion*

## I

BERGER, J. The plaintiff, Robert H. Lawrence, Jr., the owner of 3 Seagate Road in Greenwich, filed this action on July 23, 2015, against the defendant, the state of Connecticut Department of Energy and Environmental Protection (department), seeking review of a final decision of the commissioner, Robert J. Klee (commissioner). The commissioner approved the December, 2012 application of the intervening defendant, 16 Highgate Road, LLC[1] (Highgate), to construct a seventy-two foot residential dock in Greenwich Cove at 16 Highgate Road in Greenwich.[2] The application was initially approved by Tonia Selmeski of the office of Long Island Sound Programs on September 18, 2013. (Return of Record [ROR], Pleading [Pl.] # 119.00, DEEP-24.)

On October 24, 2013, a petition requesting a hearing was submitted by twenty-five individuals requiring that the department hold a hearing on the application. (ROR, Pl. # 120.00, DEEP-32.) On November 22, 2013, the plaintiff sought and was granted intervention status under General Statutes § 22a-19[3] of the Connecticut Environmental Protection Act (CEPA), General Statutes § 22a-14 et seq. (ROR, Pl. # 123.00.) Hearings were then conducted before Kenneth M. Collette in March and April, 2014, and a proposed final decision approving the application with modifications was issued on October 30, 2014. (ROR, Pl. # 113.00.)

Lawrence filed twenty-six exceptions to the decision on November 14, 2014, and requested oral argument; (ROR, Pl. # 125.00); which was heard by the commissioner on January 20, 2015. (ROR, Pl. # 114.00.) On June 23, 2015, the commissioner issued his final decision finding that the proposed activity would comply with all applicable statutes and regulations, and would not unreasonably pollute, impair or destroy the public trust in the air, water or other natural resources of the state. (ROR, Pl. # 113.00, Final Decision.)

Lawrence filed this appeal on July 23, 2015. He alleges that the final decision allowing the construction of the pier is clearly erroneous and arbitrary, capricious, and an abuse of discretion because it violates the Tidal Wetlands Act, General Statutes § 22a-28 et seq.; the Coastal Management Act, General Statutes § 22a-90 et seq.; and the Structures, Dredging and Fill Act, General Statutes § 22a-359 et seq. Specifically, he alleges that the commissioner is obligated under General Statutes § 22a-98 to "assure consistency with such goals and policies in granting or denying or modifying permits under" the Tidal Wetlands Act, the Coastal Management Act, and the Structures, Dredging and Fill Act. Section 22a-98, in relevant part, continues: "Any person seeking a license, permit or other approval of an activity under the requirements of such regulatory programs shall

demonstrate that such activity is consistent with all applicable goals and policies in section 22a-92 and that such activity incorporates all reasonable measures mitigating any adverse impacts of such actions on coastal resources . . . ."

Under this umbrella, Lawrence alleges first that the decision allowing construction of the pier is inconsistent with and contrary to General Statutes § 22a-93 (15) (F). The statute defines " '[a]dverse impacts on coastal resources' " to "include but are not limited to . . . degrading visual quality through significant alteration of the natural features of vistas and view points . . . ." Second, Lawrence asserts that allowing the pier violates General Statutes § 22a-92 (b), which, in relevant part, provides: "[T]he following policies are established for federal, state and municipal agencies in carrying out their responsibilities under this chapter . . . (1) Policies concerning development, facilities and uses within the coastal boundary are . . . (H) to protect coastal resources by requiring, where feasible, that such boating uses and facilities . . . (ii) utilize existing altered, developed or redevelopment areas . . . [and] (iv) utilize ramps and dry storage rather than slips in environmentally sensitive areas . . . ." Third, Lawrence asserts a violation of § 22a-30-10 of the Regulations of Connecticut State Agencies (regulation) concerning tidal wetlands. The regulation, in relevant part, provides: "(a) . . . The commissioner shall grant, or grant with limitations or conditions a permit to conduct a proposed activity on any wetland only if it is determined that the application is consistent with all applicable criteria set forth herein. (b) . . . In order to make a determination that a proposed activity will preserve the wetlands of the state and not lead to their despoliation and destruction the commissioner shall, as applicable, find that: (1) There is no alternative for accomplishing the applicant's objectives which is technically feasible and would further minimize adverse impacts . . . ." Lawrence asserts that the commissioner should have found that Highgate was able to utilize an existing boat launch. Finally, Lawrence alleges that construction of the pier violates § 22a-359 (a) of the Structures, Dredging and Fill Act. The statute, in relevant part, provides: "The Commissioner of Energy and Environmental Protection shall regulate dredging and the erection of structures and the placement of fill, and work incidental thereto, in the tidal, coastal or navigable waters of the state waterward of the coastal jurisdiction line. Any decisions made by the commissioner pursuant to this section shall be made with . . . proper regard for the rights and interests of all persons concerned." General Statutes § 22a-359 (a). Lawrence asserts that the commissioner failed to give proper regard to restrictive covenants that applied to Highgate's and Lawrence's properties.[4]

Highgate filed an answer, and the department filed

an answer and the record on October 30, 2015. On December 15, 2015, Lawrence filed his brief. The department and Highgate filed their briefs on February 5, 2015, and the plaintiff filed two briefs in reply on April 1, 2015. The court heard the appeal on April 12, 2015.[5]

## II

### A

The defendants contest Lawrence's standing to pursue this appeal.[6] "The fundamental aspect of standing . . . [is that] it focuses on the party seeking to get his complaint before [the] court and not on the issues he wishes to have adjudicated." (Internal quotation marks omitted.) *Mystic Marinelife Aquarium, Inc.* v. *Gill*, 175 Conn. 483, 491–92, 400 A.2d 726 (1978). "[S]tanding is not a technical rule intended to keep aggrieved parties out of court; nor is it a test of substantive rights. Rather it is a practical concept designed to ensure that courts and parties are not vexed by suits brought to vindicate nonjusticiable interests and that judicial decisions which may affect the rights of others are forged in hot controversy, with each view fairly and vigorously represented." (Internal quotation marks omitted.) *Handsome, Inc.* v. *Planning & Zoning Commission*, 317 Conn. 515, 550, 119 A.3d 541 (2015) (*Palmer, J.*, dissenting).

In *Mystic Marinelife Aquarium, Inc.*, the court set forth the standing limitations for intervenors filing under CEPA: "because [the intervening plaintiff] became a party under § 22a-19 (a) in filing a verified pleading, which set the parameters of the issues it could raise on this appeal, there is no question here that [the intervening plaintiff] can appeal. That appeal, however, is limited to raising environmental issues only, as the Superior Court properly held. Therefore, having become a proper party in the administrative proceeding, [the intervening plaintiff] had statutory standing to appeal for the limited purpose of raising environmental issues." *Mystic Marinelife Aquarium, Inc.* v. *Gill*, supra, 175 Conn. 490; see also *Finley* v. *Inland Wetlands Commission*, 289 Conn. 12, 34, 959 A.2d 569 (2008) ("[a]n intervenor pursuant to § 22a-19 has standing to bring an appeal from an agency's decision 'only to protect the natural resources of the state from pollution or destruction' "); *Red Hill Coalition, Inc.* v. *Conservation Commission*, 212 Conn. 710, 715, 563 A.2d 1339 (1989) ("[b]ecause the [plaintiff] filed a notice of intervention at the commission hearing in accordance with § 22a-19 [a], it doubtless had statutory standing to appeal from the commission's decision for that limited purpose"). But for the recent expansion allowing a challenge to the fairness of the hearing process set forth in *FairwindCT, Inc.* v. *Connecticut Siting Council*, 313 Conn. 669, 714, 99 A.3d 1038 (2014) ("[t]he right to a fundamentally fair hearing is implicit in the right to intervene pursuant to CEPA"), this qualified standing rule has remained

essentially intact. See D. Sherwood & J. Brooks, 15 Connecticut Practice Series: Connecticut Environmental Protection Act (2006) § 8:15, pp. 205–206.

In the present case, Lawrence's and Highgate's properties front the tidal waters of Long Island Sound with Lawrence's property approximately 400 feet southwest of Highgate's property. (ROR, Pl. # 121.00, INT-8; Pl. # 123.00.) Lawrence filed a notice of intervention with the department; (ROR, Pl. # 123,00); in which he specifically alleged[7] that "the structures proposed in the captioned application will cause adverse impacts on coastal resources, within the meaning of General Statutes § 22a-93 (15), by: a. Increasing the hazard of coastal flooding through significant alteration of shoreline configurations of bathymetry; b. Degrading visual quality through significant alteration of natural features of vistas and viewpoints; c. Degrading or destroying essential wildlife, finfish or shellfish habitat through significant alteration of the composition, migration patterns, distribution, breeding or other population characteristics of the natural species or significant alteration of the natural components of the habitat; and/or d. Degrading tidal wetlands, beaches and dunes, rocky shorefronts, and bluffs and escarpments through significant alteration of their natural characteristics or function." (ROR, Pl. # 123.00.)

Lawrence's complaint is, however, quite different. It, in relevant part, alleges:

"26. The Final Decision of DEEP has adversely affected (a) the Plaintiff's use and enjoyment of his home and the waters of Long Island Sound to which it is contiguous; (b) the Plaintiff's rights under the Restrictive Covenants; (c) the Plaintiff's littoral rights;[8] and (d) the value of the Plaintiff's premises. . . .

"27. In pertinent part, General Statutes § 22a-93 (15) defines 'adverse impacts on coastal resources': as including the following:

". . . '(F) [D]egrading visual quality through significant alteration of the natural features of vistas and viewpoints.'

"(The 'Vistas and Viewpoints Provision.')

"28. The Applicant's expert consultants did not consider the visual impact of the proposed structures because they did not believe that it was relevant to the Application.

"29. In granting tentative approval of the Application, DEEP Staff interpreted the Vistas and Viewpoints Provision as being applicable only to sites designated by federal, state or municipal governments as having special significance.

"30. DEEP's interpretation of the Views and Viewpoints Provision is contrary to the terms of the statute, as determined by the courts of this State.

***

"35. General Statutes § 22a-98, provides in pertinent part:

". . . The commissioner shall assure consistency with such goals and policies [referred to in the Three Acts, among other authorities] in granting, denying or modifying permits under such programs. Any person seeking a license, permit or other approval of an activity under the requirements of such regulatory programs *shall demonstrate that such activity is consistent with all applicable goals and policies in section 22a-92. . . .*" (Emphasis added.)

"36. General Statutes § 22a-92 (b) (1) provides, in pertinent part:

"In addition to the policies stated in subsection (a) of this section, the following policies are established for federal, state and municipal agencies in carrying out their responsibilities under this chapter:

". . . (H) to protect coastal resources by requiring, where feasible, that such boating uses and facilities . . .

"(ii) utilize existing altered, developed or redevelopment areas . . . and . . .

"(iv) utilize ramps and dry storage rather than slips in environmentally sensitive areas.

"(The 'Existing Facilities Provision.')

"37. The Final Decision is inconsistent with, and contrary to the Existing Facilities Provision, by interpreting it as applicable only to commercial or public boating facilities such as marinas or state-owned launch ramps.

***

"40. State Reg. 22a-30-10 . . . provides, in pertinent part:

"(a) . . . The commissioner shall grant, or grant with limitations or conditions a permit to conduct a proposed activity on any wetland *only if* is determined that the application is consistent with all applicable criteria set forth herein.

"(b) Criteria for preservation of wetland and prevention of their despoliation and destruction. *In order to make a determination that the proposed activity will preserve the wetlands of the state and will not lead to their despoliation and destruction the commissioner shall, as applicable, find that*

"(1) *There is no alternative for accomplishing the applicant's objectives which is technically feasible and would further minimize adverse impacts. . . .*

"(The 'No Feasible Alternative Provision.') (Emphasis added.)

"41. The Association's existing launching and storage area at Elias Point is a technically feasible alternative to the structures proposed in the Application.

\*\*\*

"46. In applying this balancing of interest analysis, DEEP should not have given weight in favor of the Applicant based upon its littoral rights, due to the applicability of the Restrictive Covenants.

"47. General Statutes § 22a-359 (a) provides, in pertinent part:

"The Commissioner of Energy and Environmental Protection shall regulate . . . the erection of structures . . . and work incidental thereto, in the tidal, coastal or navigable waters of the state waterward of the coastal jurisdiction line. Any decisions made by the commissioner pursuant to this section *shall be made with due regard for . . . the use and development of adjoining uplands . . .* [*and*] *the use and development of adjacent lands and properties . . . with proper regard for the rights and interests of all persons concerned.*

"(The 'Due Regard For Property Rights' Provision.) (Emphasis added.)

"48. DEEP should have considered the Due Regard For Property Rights Provision and taken into account the Restrictive Covenants." (Emphasis in original.)

As this illustrates, the department is correct that the complaint is silent concerning most of the allegations in the intervention petition. Nevertheless, in *Finley* v. *Inland Wetlands Commission*, supra, 289 Conn. 34–35, the court stated that "an intervenor pursuant to § 22a-19 has standing to appeal from the decision of an [agency] . . . only for the purpose of raising claims that are within the zone of interests that are protected under the Inland Wetlands and Watercourses Act, i.e., claims alleging the pollution, impairment or destruction of the state's inland wetlands and watercourses." Id. The *Finley* court went on to note that under *Windels* v. *Environmental Protection Commission*, 284 Conn. 268, 290, 933 A.2d 256 (2007), "[a] complaint does not sufficiently allege standing [however] by merely reciting the provisions of § [22a-19], but must set forth facts to support an inference that unreasonable pollution, impairment or destruction of a natural resource will probably result from the challenged activities unless remedial measures are taken." (Internal quotation marks omitted.) *Finley* v. *Inland Wetlands Commission*, supra, 35.

In the present case, except for allegations concerning visual impact or degradation, the complaint contains no facts concerning unreasonable pollution, impairment or destruction of any other natural resource. Under CEPA, an intervenor is limited to raising "environmen-

tal matters which impact on the particular subject of an act pursuant to which the commissioner is acting." *Connecticut Water Co.* v. *Beausoleil*, 204 Conn. 38, 46, 526 A.2d 1329 (1987). The department argues that the complaint fails to allege any CEPA based environmental harm and "exceeds the zone of interests protected by the Acts in question." Specifically, it asserts that Lawrence's claim that "the proposed structures will degrade the visual quality of natural features of vistas" is not a substantive environmental issue that analyzes harm to air, water, or other natural resources of the state.[9] Lawrence argues that the department minimizes his concern that the proposed dock will degrade the existing vista in its statement that "the dock will only minimally obscure the view of the rock outcropping surrounding the cove." (ROR, Pl. # 113.00.)

"Aggrievement is established if there is a possibility, as distinguished from a certainty, that some legally protected interest . . . has been adversely affected." (Internal quotation marks omitted.) *Huck* v. *Inland Wetlands & Watercourses Agency*, 203 Conn. 525, 530, 525 A.2d 940 (1987). "It is clear that one of the basic purposes of the [CEPA] is to give persons standing to bring actions to protect the environment and standing is conferred only to protect the natural resources of the state from pollution or destruction." *Mystic Marinelife Aquarium, Inc.* v. *Gill*, supra, 175 Conn. 499. "Mindful that the 'environment' encompasses all the factors that affect the quality of life . . . it can be seen that environmental issues may arise in a number of settings. Our courts have prudentially limited intervention under § 22a-19 (a), consistent with legislative intent, to the raising of environmental issues only." (Citation omitted.) *Zoning Commission* v. *Fairfield Resources Management, Inc.*, 41 Conn. App. 89, 116, 674 A.2d 1335 (1996).

Although not in the context of aggrievement, one Superior Court has examined § 22a-93 (15) (F). In *Fromer* v. *Lombardi*, Superior Court, judicial district of New London, Docket No. CV-91-0518691-S, 1992 WL 231185, *5 (September 14, 1992) (*Koletsky, J.*), aff'd, 33 Conn. App. 910, 633 A.2d 741 (1993), the court stated, "One who intervenes pursuant to General Statutes § 22a-19 in proceedings for coastal site plan approval before a zoning commission is limited to raising those environmental issues which are within the zoning commission's power to determine when acting on a coastal site plan." The court held that the commission made findings in accordance with § 22a-93 (15) (F) as to potential adverse impact of the proposed activity on degradation of coastal resources. Id.

In *Glendenning* v. *Conservation Commission*, 12 Conn. App. 47, 529 A.2d 727, cert. dismissed, 205 Conn. 802, 531 A.2d 936 (1987), the Appellate Court reversed the trial court's decision based upon a failure to con-

sider adequately the plaintiff's claims of aggrievement. "Although in considering an application for a permit to engage in any regulated activity a local inland wetlands and watercourses agency under both the [Inland Wetlands and Watercourses Act] and its regulations must take into account the environmental impact of the proposed project, it is the impact on the regulated area that is pertinent, and not the environmental impact in general. . . . Any aggrievement claimed on appeal from the grant of a permit for regulated activities must, therefore, arise from or relate to their impact upon the environmental factors required to be considered by the agency under the act and its regulations. Any claimed depreciation or loss of value of real estate must result from such environmental impact. Additional claims of aggrievement may arise from the environmental impact of the permitted activities on the regulated area. . . .

"Environmental matters provide a new breadth to claims of aggrievement, one created by the governmental trusteeship of the environment for the benefit of the public. Monetary loss, such as was the sole consideration of the trial court here, is not the complete measure of aggrievement in environmental appeals and judicial review." (Citations omitted.) Id., 52–53.

The court continued, "In the case before us, the commission in its decision specifically found the following anticipated environmental impact from the permitted regulated activities: 'There may be a significant loss of view of the Harbor by the adjacent property owners. This proposal will also displace the existing lobster fishery. From an aesthetic point of view, this proposal is a particularly intensive development of waterfront property, and the applicant has proposed no compensatory activities to ameliorate the loss of unobstructed visual Harbor contact.' These stated injurious consequences of the permitted activities were alleged as claims of aggrievement by the plaintiffs in their complaint. While a transcript of the trial testimony has not been supplied with the record in this case, that evidence thereon was submitted to the court is confirmed by its memorandum of decision as follows: 'Both during the public hearing and the hearing on aggrievement before this court, the plaintiffs expressed sincere concern that the granting of this application would result in the destruction of a panoramic view of a beautiful and tranquil harbor, the loss of historic and aesthetic values and a diminution of the opportunity of citizens to seek serenity and spiritual renewal from the simple enjoyment of an unencumbered view of a unique vista. The court cannot and certainly does not wish to minimize the importance of such considerations.' " Id., 55–56.

In remanding for a rehearing on aggrievement, the court held, "Notwithstanding such evidentiary recognition of the plaintiffs' claims of aggrievement, as well as the commission's anticipated environmental impact

upon which they are based, the court failed to make any findings or conclusions therefrom concerning the plaintiffs' asserted aggrievement. The court's sole finding to support its conclusion of lack of aggrievement was the following: 'This Court has reservations and finds the claim that the mere construction of a building which might partially interfere with the view of neighboring landowners significantly depreciates the value of their properties to be highly speculative.' In so limiting its finding, the court erred in the standard of aggrievement that it applied in this case. The court should have considered the plaintiffs' claims and evidence of aggrievement in relation to the commission's anticipated environmental impact for the purpose of making findings thereon and drawing its conclusions therefrom as to the plaintiffs' aggrievement." Id., 56.

In the present case, visual impact is an express consideration under § 22a-93 (15) (F).[10] Lawrence had alleged visual impact in his notice of intervention before the department and alleges it in his complaint here. (ROR, Pl. # 123.00.) Additionally, evidence of visual impact was brought before the commission. (ROR, Pl. # 114.00.) Therefore, the court finds that Lawrence is aggrieved and may pursue his statutory CEPA claim of visual degradation in light of the alleged violations of the three environmental statutes. See *Finley* v. *Inland Wetlands Commission*, supra, 289 Conn. 34 (concluding that plaintiffs as intervenors in proceedings before commission pursuant to § 22a-19 were entitled to appeal to trial court from commission's decision pursuant to General Statutes § 22a-43).

### B

Lawrence also alleges essentially three other non-CEPA claims.[11] In paragraph thirty-four, he alleges that the proposed dock "will be usable for paddleboards less than sixty percent of each tidal cycle." In paragraph fifty-three, he asserts that "[t]he condition of the seabed in the area of the proposed structure is so soft that it is, effectively, 'quicksand' and dangerous to any person who, intentionally or unintentionally, steps or falls in the seabed."[12] In paragraph fifty-nine, he alleges that "[a] severe storm would likely dislodge the dock and/or ramp, causing damage and/or injury to nearby properties, including the Plaintiff's premises and/or the Plaintiff." These claims are subject to the test for classical aggrievement. See *Red Hill Coalition, Inc.* v. *Conservation Commission*, supra, 212 Conn. 716–17 ("[f]rom our review of the record we cannot say that the trial court erred when it found that [an abutting plaintiff] had, in addition to standing under § 22a-19, 'the more traditional aggrievement standing of having a specific, personal and legal interest in the subject matter of the [commission's] decision' "), citing *Glendenning* v. *Conservation Commission*, supra, 12 Conn. App. 54.

"[P]leading and proof of aggrievement are prerequisites to a trial court's jurisdiction over the subject matter of an administrative appeal. . . . It is [therefore] fundamental that, in order to have standing to bring an administrative appeal, a person must be aggrieved." (Citation omitted; internal quotation marks omitted.) *Bongiorno Supermarket, Inc.* v. *Zoning Board of Appeals*, 266 Conn. 531, 537–38, 833 A.2d 883 (2003). "The fundamental test for determining [classical] aggrievement encompasses a well-settled twofold determination: first, the party claiming aggrievement must successfully demonstrate a specific personal and legal interest in the subject matter of the decision, as distinguished from a general interest, such as is the concern of all the members of the community as a whole. Second, the party claiming aggrievement must successfully establish that the specific personal and legal interest has been specially and injuriously affected by the decision." (Internal quotation marks omitted.) Id., 539. "To be aggrieved . . . requires that property rights be adversely affected by an 'order, authorization or decision' of the commission[er]. . . . We have already stated that the property rights that may be subject to aggrievement need not be confined to real property rights. . . . Aggrievement is an issue of fact . . . ." (Citations omitted; internal quotation marks omitted.) *Mystic Marinelife Aquarium, Inc.*, supra, 175 Conn. 495–96.

In the present case, Lawrence's non-CEPA claims do not meet the classical aggrievement test. Specifically, he cannot and has not demonstrated "a specific personal and legal interest in the subject matter of the decision, as distinguished from a general interest, such as is the concern of all the members of the community as a whole" or that such an interest has been "specially and injuriously affected by the decision." (Internal quotation marks omitted.) *Bongiorno Supermarket, Inc.* v. *Zoning Board of Appeals*, supra, 266 Conn. 539. Therefore, Lawrence does not have standing to pursue these claims.

### III

As to Lawrence's statutory CEPA claim of visual degradation, "[t]he substantial evidence rule governs judicial review of administrative fact-finding under [the Uniform Administrative Procedure Act]. General Statutes § 4-183 (j) (5) and (6). Substantial evidence exists if the administrative record affords a substantial basis of fact from which the fact in issue can be reasonably inferred. . . . This substantial evidence standard is highly deferential and permits less judicial scrutiny than a clearly erroneous or weight of the evidence standard of review. . . . The reviewing court must take into account [that there is] contradictory evidence in the record . . . but the possibility of drawing two inconsistent conclusions from the evidence does not prevent

an administrative agency's finding from being supported by substantial evidence . . . . The burden is on the [plaintiff] to demonstrate that the [department's] factual conclusions were not supported by the weight of substantial evidence on the whole record." (Internal quotation marks omitted.) *Shanahan* v. *Dept. of Environmental Protection*, 305 Conn. 681, 700, 47 A.3d 364 (2012).

"Judicial review of an administrative agency decision requires a court to determine whether there is substantial evidence in the administrative record to support the agency's findings of basic fact and whether the conclusions drawn from those facts are reasonable. . . . This so-called substantial evidence rule is similar to the sufficiency of the evidence standard applied in judicial review of jury verdicts, and evidence is sufficient to sustain an agency finding if it affords a substantial basis of fact from which the fact in issue can be reasonably inferred. . . . [I]t imposes an important limitation on the power of the courts to overturn a decision of an administrative agency . . . and [provides] a more restrictive standard of review than standards embodying review of weight of the evidence or clearly erroneous action. . . . The United States Supreme Court, in defining substantial evidence . . . has said that it is something less than the weight of the evidence, and [that] the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence. . . . [T]he credibility of witnesses and the determination of factual issues are matters within the province of the administrative agency. . . . As with any administrative appeal, our role is not to reexamine the evidence presented to the council or to substitute our judgment for the agency's expertise, but, rather, to determine whether there was substantial evidence to support its conclusions." (Citations omitted; internal quotation marks omitted.) *FairwindCT, Inc.* v. *Connecticut Siting Council*, supra, 313 Conn. 689–90.

"In reviewing decisions made by an administrative agency, a reviewing court must sustain the agency's determination if an examination of the record discloses evidence that supports any one of the reasons given. . . . The evidence, however, to support any such reason must be substantial . . . ." (Internal quotation marks omitted.) *Adriani* v. *Commission on Human Rights & Opportunities*, 228 Conn. 545, 550–51, 636 A.2d 1360 (1994).

IV

Greenwich Cove is not pristine; it is not without development. The record reveals that it contains homes, docks and floats, seawalls, a causeway, and approximately 300 moorings just beyond the mouth of the cove. (ROR, Pl. # 113.00; Pl. # 114.00, Transcript [Tr.], 3/27/

14, p. 123.) Highgate's application seeks to add another dock to this harbor setting. All of Lawrence's surviving claims concern the subjective visual impact of the pier. Thus, this court's review is not unlike that in cell tower siting cases where aesthetic concerns must be satisfied under local zoning regulations. See, e.g., *Farmington* v. *Viacom Broadcasting, Inc.*, 10 Conn. App. 190, 196, 522 A.2d 318 (holding that it was "within the scope of the zoning regulations for the commission to impose conditions related to aesthetics and property values on the granting of the special exception"), cert. denied, 203 Conn. 808, 525 A.2d 523 (1987). As in those cases, "aesthetic concerns *can* be a valid basis for denial of a permit by a local governing body, *so long as* a judgment based on those concerns is supported by objective facts or evidence."[13] (Emphasis in original; internal quotation marks omitted.) *Wireless Towers, LLC* v. *Jacksonville*, 712 F. Supp. 2d 1294, 1302 (M.D. Fla. 2010).

Aesthetic concerns must be examined, however, in terms of Highgate's ability to exercise its littoral right to wharf subject to certain regulations. "The owner of land adjoining waters in which the tide ebbs and flows has the exclusive right to dig channels and build wharves from his land to reach deep water, so long as he does not interfere with free navigation. . . . There is no reason why, because of its peculiar nature as property, this right cannot, like any other property right, be made subject to reasonable police regulation in the interest of the public welfare." (Citations omitted.) *Shorehaven Golf Club, Inc.* v. *Water Resources Commission*, 146 Conn. 619, 624, 153 A.2d 444 (1959); see also *Port Clinton Associates* v. *Board of Selectmen*, 217 Conn. 588, 598, 587 A.2d 126 ("[t]he owner of riparian rights . . . has the right to build a pier or wharf past the low water mark subject to the qualification that he thereby does no injury to the free navigation of the water by the public" [internal quotation marks omitted]), cert. denied, 502 U.S. 814, 112 S. Ct. 64, 116 L. Ed. 2d 39 (1991). The legislature again emphasized this common-law right, subject to the police power, recently in No. 12-101 of the 2012 Public Acts. Public Act 12-101 amended § 22a-92 (a) (1) so that it now, in relevant part, provides: "[t]o ensure that the development, preservation or use of the land and water resources of the coastal area proceeds in a manner *consistent with the rights of private property owners* . . . ." (Emphasis added.)

Lawrence testified that he loves the current view of the cove and does not wish it to change. (ROR, Pl. # 114.00, Tr., 4/3/14, pp. 73–74.) This court does not dispute that the cove, even with the existing houses, seawalls, docks, sailboats, and the large causeway to Elias Point, is pleasant and a natural resource that is subject to protection like all of Connecticut's coastal areas. See General Statutes § 22a-90 et seq. Nevertheless, there are existing structures and development in the cove.

See *Coen* v. *Ledyard Zoning Commission*, Superior Court, judicial district of New Britain, Docket No. CV-10-6007515-S, 2011 WL 5307400 (October 19, 2011) (*Schuman*, *J.*) (considering overall character of area in assessing impact on view). Balancing this with Highgate's common-law right to wharf as well as the statutory right under § 22a-92 (a) (1), the record does not support the claim that this new dock will degrade the "visual quality through significant alteration of the natural features of vistas and view points" under § 22a-93 (15) (F) or *unreasonably* impair or destroy the public trust in the natural resources of the state under § 22a-19 (a) (1). (ROR, Pl. # 114.00, Tr., 3/24/14, p. 195; Tr., 3/25/14, pp. 61–65; Tr., 3/27/14, pp. 92–93, 107.)

"It is clear that § 22a-19, consistent with the rest of the act, was intended, not as a mere impediment to developers, but rather as a means to protect the environment from unreasonable adverse impact." *Paige* v. *Town Plan & Zoning Commission*, 235 Conn. 448, 462, 668 A.2d 340 (1995). As previously stated, this case only concerns the visual impact of Highgate's proposed pier; there is no extant claim that it will unreasonably impair or destroy other natural resources. Indeed, the commissioner found that "the record . . . demonstrates that the impact of the proposed project to the tidal wetlands, the intertidal flat, wildlife and other natural resources in the area is minimal." (ROR, Pl. # 113.00, Final Decision, p. 6.) Further, "the record reflects that the dock is likely to have a positive impact on the vegetation in the tidal wetlands, due in part to the planned removal of stone debris in the area as required by the permit terms, which will create an additional 600 to 700 square feet of wetlands and allow tidal vegetation to repopulate the area. In addition, the dock will provide a way of accessing the water without walking through the tidal wetlands and thus will curb the physical breakage, uprooting and trampling of vegetation in the wetlands that is currently occurring." (ROR, # 113.00, Final Decision, p. 10.)

The commissioner was required to analyze the application in light of the applicable statutory provisions. First, the commissioner was required to consider whether the pier constituted an adverse impact on coastal resources by "degrading visual quality through significant alteration of the natural features of vistas and view points" under § 22a-93 (15) (F). There is no dispute that he addressed this as a factor in his final decision. (ROR, # 113.00, Final Decision, pp. 3–5.) Moreover, the record contains substantial evidence for him to find that such degradation did not exist. See *Adriani* v. *Commission on Human Rights & Opportunities*, supra, 228 Conn. 550–51; see also *Wireless Towers, LLC* v. *Jacksonville*, supra, 712 F. Supp. 2d 1305 ("This Court is not unsympathetic to the difficulty an applicant has in meeting the aesthetic standard of [the ordinance], especially where opinions as to 'adverse impact' and

'compatibility' can differ. However, subjective though the standard may be, it is similar to other subjective determinations that local zoning and land use bodies routinely make. In any event, pursuant to the [ordinance], the Commission properly considered the Proposed Tower's 'potential adverse impact' on the Preserve and made a subjective determination, supported by objective evidence, that the Proposed Tower was aesthetically incompatible with the surrounding area."). The commissioner recognized that the claim is subjective and, as admitted by Lawrence, that "beauty is in the eye of the beholder." Nevertheless, the commissioner balanced this with the objective evidence in the record reflecting the current "heavy developed" character of the cove, including homes, hardened shorelines, existing docks, moorings, and boats;[14] reliance on past department practices and permits; his finding that the view of the rock outcropping will only be minimally obscured; and the positive impact on the tidal wetlands. (ROR, Pl. # 114.00, Tr., 4/2/14, p. 14; Tr., 4/3/14, pp. 13, 74, 137–38; Pl. # 113.00, Final Decision, pp. 3–5, 10.)

In addition to this factor, the commissioner was required to consider and balance the policies set forth in § 22a-92 (b) (1) (H) (ii) and (iv), i.e., to consider, where feasible, the utilization of "existing altered, developed or redevelopment areas," and "ramps and dry storage rather than slips in environmentally sensitive areas," which, in the present case, means the existing community boat launch.[15] See *Corcoran* v. *Connecticut Siting Council*, 50 Conn. Supp. 443, 449, 934 A.2d 870 (2006) ("[t]he council thus performed its statutory obligation . . . to balance competing concerns against the need for the coverage, and did not abuse its discretion"), aff'd, 284 Conn. 455, 934 A.2d 825 (2007). Related to this is the required finding under the regulation[16] of no feasible alternative. Whether Highgate should appropriately forgo its right to wharf because of the association's facility is not the question—the existence of the community facility does not automatically preclude the right of Highgate to construct its pier. Rather, the issue is whether the commissioner analyzed this application to construct a pier under the substantial evidence standard in light of our relevant environmental statutes, regulations, and other appropriate factors.

The commissioner noted the salutary purpose of § 22a-92 (b) (1) (H) to " 'utilize existing altered, developed or redevelopment areas,' where feasible, is aimed at encouraging the smart development of coastal areas particularly facilities like marinas or state boat launches that are not necessarily limited to one particular upland parcel." (ROR, Pl. # 113.00, Final Decision, p. 6.) Yet, this goal must be balanced with the littoral owner's right to wharf and is subject to reasonable regulation. See General Statutes § 22a-92 (a) (1); see also *Port Clinton Associates* v. *Board of Selectmen*, supra, 217 Conn. 598. Highgate's first two proposals were rejected.

See footnote 2 of this memorandum of decision. While cases may exist where a structure could be modified, or perhaps even rejected, due to the existence of another facility, nothing in the statute[17] suggests that such a policy was meant to preclude a private property owner's right to wharf in the first instance.[18] Indeed, as noted by the commissioner, the express language of the regulation; see footnote 16 of this memorandum of decision; "speaks in terms of impact minimization rather than avoidance." (ROR, Pl. # 113.00, Final Decision, p. 7.) The commissioner considered this statutory and regulatory framework; (ROR, Pl. # 113.00, Final Decision, pp. 5–7.); and substantial evidence supports his decision. (ROR, Pl. # 113.00, Final Decision, pp. 6, 9–11; Pl. # 114.00, Tr., 3/24/14, pp. 178–79; Tr., 3/25/14, p. 176; Tr., 3/27/14, p. 96; Pl. # 117.00, DEEP-1-DEEP-3.)

Finally, Lawrence alleges that the commissioner violated § 22a-359 of the Structures, Dredging and Fill Act for failing to give proper regard to the restrictive covenants of the association, which state that "no building or structure shall be erected or maintained upon the premises hereby conveyed other than one single family dwelling house with garage, if any, attached, except with the written consent of the grantor or its successors or assigns." The commissioner found that "[a]bsent an express bar to construction, the mere existence of restrictive covenants that may impact a proposed project or require third party approvals does not preclude DEEP from issuing a permit." (ROR, Pl. # 113.00, Final Decision, p. 7.) Indeed, the commissioner noted, "[s]ecuring a DEEP permit does not excuse the Applicant from securing other necessary approvals, and the language of the permit . . . makes clear that the permittee remains obligated to obtain any other approvals required by federal, state and local law, including any approval required through a deed restriction." (ROR, Pl. # 113.00, Final Decision, pp. 7–8.)

"[T]he law is well established that restrictive covenants in a deed as to [the] use of property are distinct and separate from [the] provisions of [a] zoning law and have no influence or part in the administration of [a] zoning law." (Internal quotation marks omitted.) *Anniello* v. *Planning & Zoning Commission*, Superior Court, judicial district of Tolland, Docket No. CV-93-0052916-S, 1995 WL 493781, *3 (August 14, 1995) (*Klaczak, J.*), quoting 83 Am. Jur. 2d, Zoning and Planning § 1006 (1992). In *Moscowitz* v. *Planning & Zoning Commission*, 16 Conn. App. 303, 311–12 n.8, 547 A.2d 569 (1988), the court noted, "[A] planning commission cannot base its denial of subdivision approval on the existence of a deed restriction if the application otherwise meets the regulations. . . . The responsibility of enforcing restrictive covenants in deeds is allocated to neighboring landowners, not to a municipal commission." (Citations omitted.) See also *Gagnon* v. *Municipal Planning Commission*, 10 Conn. App. 54, 58, 521

A.2d 589 ("[t]he commission does not have authority to determine whether the claimed right of way was a legally protected and enforceable prescriptive easement, since that conclusion can only be made by judicial authority in a quiet title action"), cert. denied, 203 Conn. 807, 525 A.2d 521 (1987); *Lunn* v. *Darien Zoning Board of Appeals*, Superior Court, judicial district of Fairfield, Docket Nos. CV-92-0299972-S and CV-92-0299973-S, 1994 WL 65284, *3 (February 25, 1994) (*Fuller, J.*) ("[w]hen a land use agency reviews applications to it, it cannot properly consider private property interests and deed restrictions"). Similarly, in the present case, it was not the commissioner's duty to enforce those restrictions.[19] Moreover, the commissioner analyzed this issue and made a decision "with proper regard for the rights and interests of all persons concerned" in accordance with § 22a-359 (a). (ROR, Pl. # 113.00, Final Decision, pp. 7–8.)

In sum, Lawrence has failed to prove that the proposed pier construction will unreasonably pollute, impair or destroy the public trust in the air, water or other natural resources of the state. Additionally, he has not shown that the commissioner's decision was not based on substantial evidence in the record or that he failed to consider any of the statutes[20] or the regulation. Therefore, the appeal is dismissed.

* Affirmed. *Lawrence* v. *Dept. of Energy & Environmental Protection*, 178 Conn. App.     ,     A.3d     (2017).

[1] Highgate moved to intervene in this action on August 13, 2015; the court, *Schuman, J.*, granted the motion on August 14, 2015. According to Highgate's brief, Timothy Coleman and Allison Coleman are the members of Highgate and occupy a single-family house on the property. The southerly portion of the property is on an inlet that is part of Greenwich Cove along the waters of Long Island Sound and "contains a rock ledge outcrop elevated approximately ten feet above tidal wetlands and an intertidal flat area." (Return of Record [ROR], Pleading [Pl.] # 119.00, DEEP-23.) Lawrence alleges in paragraph eleven of his complaint that Highgate's proposed structures would be built on top of the ledge outcrop, thereby obscuring it.

[2] According to the record, the application for the dock was the third iteration. Highgate had submitted two prior versions, the first 180 feet in length and the second 100 feet in length. (ROR, Pl. # 117.00, DEEP-3.) This version is a four feet by seventy-two feet fixed timber and steel framed pier with a three feet by thirty-eight feet aluminum gangway and an eight feet by twelve and one-half feet floating dock secured by four float anchor piles. (ROR, Pl. # 117.00, DEEP-3.)

[3] General Statutes § 22a-19 provides: "(a) (1) In any administrative, licensing or other proceeding, and in any judicial review thereof made available by law, the Attorney General, any political subdivision of the state, any instrumentality or agency of the state or of a political subdivision thereof, any person, partnership, corporation, association, organization or other legal entity may intervene as a party on the filing of a verified pleading asserting that the proceeding or action for judicial review involves conduct which has, or which is reasonably likely to have, the effect of unreasonably polluting, impairing or destroying the public trust in the air, water or other natural resources of the state.

"(2) The verified pleading shall contain specific factual allegations setting forth the nature of the alleged unreasonable pollution, impairment or destruction of the public trust in air, water or other natural resources of the state and should be sufficient to allow the reviewing authority to determine from the verified pleading whether the intervention implicates an issue within the reviewing authority's jurisdiction. For purposes of this section, 'reviewing authority' means the board, commission or other decision-making authority in any administrative, licensing or other proceeding or the court in any judicial review.

"(b) In any administrative, licensing or other proceeding, the agency shall consider the alleged unreasonable pollution, impairment or destruction of the public trust in the air, water or other natural resources of the state and no conduct shall be authorized or approved which does, or is reasonably likely to, have such effect as long as, considering all relevant surrounding circumstances and factors, there is a feasible and prudent alternative consistent with the reasonable requirements of the public health, safety and welfare."

[4] Both Lawrence's and Highgate's properties are subject to restrictive covenants dated April, 1954, as set forth in the Greenwich land records. The covenants state, in relevant part, that "no building or structure shall be erected or maintained upon the premises hereby conveyed other than one single family dwelling house with garage, if any, attached, except with the written consent of the grantor or its successors or assigns." (ROR, Pl. # 121.00, INT-1, p. 2.) Lawrence alleges in paragraphs four through eight of his complaint, that Harbor Point Association, Inc., became the successor and assignee of the grantor of the covenants in 1958.

[5] Pursuant to General Statutes § 4-183 (c), the matter was returned to the judicial district of New Britain and was transferred to this docket on February 17, 2016.

[6] On April 12, 2016, the parties agreed that in light of the factual evidence in the record, Lawrence need not further testify concerning aggrievement except insofar as he still owned his property.

[7] General Statutes § 22a-19 (a) (2), in relevant part, requires: "The verified pleading shall contain specific factual allegations setting forth the nature of the alleged unreasonable pollution, impairment or destruction of the public trust in air, water or other natural resources of the state . . . ."

[8] "Black's Law Dictionary (6th Ed. 1990) defines 'littoral rights' as: 'Rights concerning properties abutting an ocean, sea or lake rather than a river or stream (riparian).' " *Water Street Associates Ltd. Partnership* v. *Innopak Plastics Corp.*, 230 Conn. 764, 766 n.3, 646 A.2d 790 (1994).

[9] The department takes this argument a step further by asserting that the "vistas and view points" provision constitutes only an aesthetic consideration. Statutory considerations of aesthetic, scenic and visual quality impacts; see, e.g., General Statutes §§ 22a-28, 22a-36, 22a-91 and 22a-93 (15) (F); are, however, different than the traditional view that regulating aesthetic impacts are not within an agency's police power. See *Silitschanu* v. *Groesbeck*, 208 Conn. 312, 317–18, 543 A.2d 737 (1988) ("The photographs were introduced as evidence of the plaintiffs' conjecture as to the impact of the proposed building on the scenic view. Such evidence, representing nothing more than the plaintiffs' speculation as to the potential harm posed by the proposed building, does not rise to the level of a demonstration of irreparable injury." [Footnote omitted.]); *New Haven* v. *United Illuminating Co.*, 168 Conn. 478, 495, 362 A.2d 785 (1975) ("[n]either the stipulated facts as found by the court nor the exhibits incorporated in its finding disclose the existence of any statute . . . which might conceivably serve as the basis for its claimed right to light, air, and view unobstructed by such structures as the towers and lines involved in this case"); *DeMaria* v. *Planning & Zoning Commission*, 159 Conn. 534, 541, 271 A.2d 105 (1970) ("[c]ertainly, vague and undefined aesthetic considerations alone are insufficient to support the invocation of the police power, which is the source of all zoning authority"); see also R. Fuller, 9 Connecticut Practice Series: Land Use Law and Practice (4th Ed. 2015) § 4:48, p. 185 ("[t]he Connecticut decisions presently allow aesthetics to be considered in two situations: [1] in an historical preservation context, and [2] where a statute provides for it"). Additionally, a more modern view is that aesthetics may be a consideration within police powers. See, e.g., *McCormick* v. *Lawrence*, 83 Misc. 2d 64, 67, 372 N.Y.S.2d 156 (1975) ("[h]owever reluctant courts have been in the past to allow aesthetic considerations alone to justify the use of police power . . . the courts now recognize aesthetics as a legitimate concept within the general police powers" [citation omitted]), aff'd, 54 App. Div. 2d 123, 387 N.Y.S.2d 919 (1976), leave to appeal denied, 41 N.Y.2d 801, 362 N.E.2d 626, 393 N.Y.S.2d 1025, and appeal dismissed, 41 N.Y.2d 900, 362 N.E.2d 641, 393 N.Y.S.2d 1029 (1977); see also 2 A. Rathkopf & D. Rathkopf, Law of Zoning and Planning (2005) § 16:5, pp. 16-20 through 16-25. Indeed, the United States Supreme Court noted in *Berman* v. *Parker*, 348 U.S. 26, 33, 75 S. Ct. 98, 99 L. Ed. 27 (1954), "The concept of the public welfare is broad and inclusive. . . . The values it represents are spiritual as well as physical, aesthetic as well as monetary. It is within the power of the legislature to determine that the community should be beautiful as well as healthy, spacious as well as

clean . . . ." (Citation omitted.)

[10] Moreover, § 22a-359 (a), in relevant part, provides that "[a]ny decisions made by the commissioner pursuant to this section shall be made with due regard for . . . the use and development of adjoining uplands . . . the use and development of adjacent lands and properties and the interests of the state, including . . . recreational use of public water and management of coastal resources, *with proper regard for the rights and interests of all persons concerned.*" (Emphasis added.) The concern for visual impact in the Costal Management Act is arguably a right and interest of all.

[11] Other allegations are subsumed in broader claims. As noted, Lawrence has also claimed that the commissioner failed to consider the restrictive covenants, which will be discussed hereinafter.

[12] Timothy Coleman testified that people have been injured crossing the wetlands and rocks while trying to reach the water, and that he has gotten stuck in mud that was knee deep. (ROR, Pl. # 114.00, Transcript [Tr.], 3/24/14, pp. 13–14.)

[13] In *Wireless Towers*, *LLC*, the city's zoning ordinance, in relevant part, provided: "The Commission shall approve, deny, or conditionally approve the application where it finds that the proposed tower (1) complies with the tower siting and design standards and performance standards of this Subpart; and (2) is compatible with the existing contiguous uses or zoning and compatible with the general character and aesthetics of the surrounding neighborhood or area, considering (a) the design and height of the wireless communication tower; and (b) the potential adverse impact upon any environmentally sensitive lands, historic districts or historic landmarks, public parks or transportation view corridors." (Emphasis omitted; internal quotation marks omitted.) *Wireless Towers*, *LLC* v. *Jacksonville*, supra, 712 F. Supp. 2d 1296.

[14] The developed nature of the cove is thus contrasted with the facts in *McCormick* v. *Lawrence*, 54 App. Div. 2d 123, 125, 387 N.Y.S.2d 919 (1976), leave to appeal denied, 41 N.Y.2d 801, 362 N.E.2d 626, 393 N.Y.S.2d 1025, and appeal dismissed, 41 N.Y.2d 900, 362 N.E.2d 641, 393 N.Y.S.2d 1029 (1977), in which the court concluded, "The area surrounding petitioners' property is in a relatively pristine state and the agency could reasonably find that the addition of several boathouses on petitioners' property would adversely affect the aesthetic quality of the area. The adverse effect is more apparent considering that the subject property fronts on a much traveled pleasure boat route."

[15] The department and Highgate maintain that § 22a-92 (b) (1) (H) applies only to state owned or commercial facilities. Specifically, the commissioner found that "§ 22a-92 (b) (1) (H) refers to commercial or public boating facilities such as marinas or state owned launch ramps, and not individual private docks." (ROR, Pl. # 113.00, Final Decision, p. 6.) In light of the commissioner's other findings, this court need not address that issue.

[16] The regulation more fully provides: "In order to make a determination that a proposed activity will preserve the wetlands of the state and not lead to their despoliation and destruction the commissioner shall, as applicable, find that: (1) There is no alternative for accomplishing the applicant's objectives which is technically feasible and would further minimize adverse impacts; (2) Any structure or fill will be no greater in length, width and height than necessary to accomplish its intended function; (3) Pile supported construction will be used to the fullest extent practicable; (4) All reasonable measures which would minimize the adverse impacts of the proposed activity on the wetlands of the state and adjoining coastal and tidal resources are incorporated as limitations on or conditions to the permit. . . ." Regs., Conn. State Agencies § 22a-30-10.

[17] "The principles that govern statutory construction are well established. When construing a statute, [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case, including the question of whether the language actually does apply. . . . In seeking to determine that meaning, General Statutes § 1-2z directs us first to consider the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered." (Internal quotation marks omitted.) *Southern New England Telephone Co.* v. *Cashman*, 283 Conn. 644, 650, 931 A.2d 142 (2007).

[18] This would not prevent, however, the enforcement of a restrictive cove-

nant by those it was intended to protect. See, e.g., *Contegni* v. *Payne*, 18 Conn. App. 47, 557 A.2d 122, cert. denied, 211 Conn. 806, 559 A.2d 1140 (1989).

[19] The department could have a permitting process requiring the applicant to receive all restrictive covenant approvals prior to submitting an application. That would not necessarily resolve this type of issue since it is likely that those conducting the first inquiry would probably want to know what is being constructed, which could not necessarily be answered, as the proposal could change as it did in this case. Hence, such a procedure might not be useful; it is impossible to know what the other agency will require. The commissioner's policy of only examining the application without dealing with the restrictive covenant (unless the covenant contained an absolute ban) is thus not unreasonable.

[20] "[W]hen there is an environmental legislative and regulatory scheme in place that specifically governs the conduct that the plaintiff claims constitutes an unreasonable impairment under CEPA, whether the conduct is unreasonable under CEPA will depend on whether it complies with that scheme." *Waterbury* v. *Washington*, 260 Conn. 506, 557, 800 A.2d 1102, (2002).

---